UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**AMENDED COMPLAINT**

-------------------------------------------------------------------X

JACLYN SCOGLIO, KASEY WEHRHEIM,
ANDREA VAN EPPS, JEAN-MARIE TAS,
DONNA RUDDY, AMANDA PETRONIO, FARAH
MARTIN, SHERRIE ORESTIS, BRANDON LLOYD,
CORINNE GORNIOK, MAGGIE OLSEN, BREANNA
MCINTYRE, and SUZANNE CHIORANDO,

**JURY TRIAL DEMANDED**

Case No.: 2:15-cv-05214-SJF-GRB

Plaintiffs,

    -against-

RIVERHEAD CHARTER SCHOOLS and RAYMOND
ANKRUM

Defendants.

-------------------------------------------------------------------X

Plaintiffs by their attorneys, **DELL & DEAN, PLLC**, complaining of the Defendants

respectfully sets forth and alleges as follows:

<u>**NATURE OF CASE**</u>

1)      This is an action for monetary damages and other redress brought by the Plaintiffs

against the Defendants for unlawful racial discrimination, gender discrimination, age

discrimination, disability discrimination, religion discrimination, sexual orientation

discrimination, sexual harassment, third-party sexual harassment, and retaliation in violation of

New York State Law, namely Article 15 §§ 290 et seq of the Executive Law, also known as the

New York State Human Rights Law, (hereinafter, "NYSHRL"), and United States law, namely

Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.*) and 42 U.S.C. § 1981

(hereinafter referred to collectively, "§ 1981"), the Americans with Disabilities Act (hereinafter

"ADA"), and the Age Discrimination in Employment Act (hereinafter, "ADEA"), and for

negligent hiring, wrongful termination, and illegal employment practices, and for any other

cause(s) of action that can be inferred from the facts set forth herein.

## PARTIES

1)      Plaintiff, JACLYN SCOGLIO, is a female citizen of Suffolk County, New York. At all times relevant, Plaintiff was employed by Defendant RIVERHEAD CHARTER SCHOOLS, under the direct supervision of her supervisor, Defendant, RAYMOND ANKRUM. At all times relevant herein, Plaintiff was an "employee" within the meaning of NYSHRL and § 1981.

2)      Plaintiff, KASEY WEHRHEIM, is a female citizen of Suffolk County, New York. At all times relevant, Plaintiff was employed by Defendant RIVERHEAD CHARTER SCHOOLS, under the direct supervision of her supervisor, Defendant, RAYMOND ANKRUM. At all times relevant herein, Plaintiff was an "employee" within the meaning of NYSHRL and § 1981.

3)      Plaintiff, ANDREA VAN EPPS, is a female citizen of Suffolk County, New York. At all times relevant, Plaintiff was employed by Defendant RIVERHEAD CHARTER SCHOOLS, under the direct supervision of her supervisor, Defendant, RAYMOND ANKRUM. At all times relevant herein, Plaintiff was an "employee" within the meaning of NYSHRL and § 1981.

4)      Plaintiff, JEAN-MARIE TAS, is a female citizen of Suffolk County, New York. At all times relevant, Plaintiff was employed by Defendant RIVERHEAD CHARTER SCHOOLS, under the direct supervision of her supervisor, Defendant, RAYMOND ANKRUM. At all times relevant herein, Plaintiff was an "employee" within the meaning of NYSHRL and § 1981.

5)      Plaintiff, DONNA RUDDY, is a female citizen of Suffolk County, New York. At all times relevant, Plaintiff was employed by Defendant RIVERHEAD CHARTER SCHOOLS,

under the direct supervision of her supervisor, Defendant, RAYMOND ANKRUM. At all times relevant herein, Plaintiff was an "employee" within the meaning of NYSHRL and § 1981.

6)      Plaintiff, AMANDA PETRONIO, is a female citizen of Suffolk County, New York. At all times relevant, Plaintiff was employed by Defendant RIVERHEAD CHARTER SCHOOLS, under the direct supervision of her supervisor, Defendant, RAYMOND ANKRUM. At all times relevant herein, Plaintiff was an "employee" within the meaning of NYSHRL and § 1981.

7)      Plaintiff, FARAH MARTIN, is a female citizen of Suffolk County, New York. At all times relevant, Plaintiff was employed by Defendant RIVERHEAD CHARTER SCHOOLS, under the direct supervision of her supervisor, Defendant, RAYMOND ANKRUM. At all times relevant herein, Plaintiff was an "employee" within the meaning of NYSHRL and § 1981.

8)      Plaintiff, SHERRIE ORESTIS, is a female citizen of Suffolk County, New York. At all times relevant, Plaintiff was employed by Defendant RIVERHEAD CHARTER SCHOOLS, under the direct supervision of her supervisor, Defendant, RAYMOND ANKRUM. At all times relevant herein, Plaintiff was an "employee" within the meaning of NYSHRL and § 1981.

9)      Plaintiff, BRANDON LLOYD, is a male citizen of Suffolk County, New York. At all times relevant, Plaintiff was employed by Defendant RIVERHEAD CHARTER SCHOOLS, under the direct supervision of her supervisor, Defendant, RAYMOND ANKRUM. At all times relevant herein, Plaintiff was an "employee" within the meaning of NYSHRL and § 1981.

10)     Plaintiff, CORINNE GORNIOK, is a female citizen of Suffolk County, New York. At all times relevant, Plaintiff was employed by Defendant, RIVERHEAD CHARTER

SCHOOL, under the direct supervision of her supervisor, Defendant, RAYMOND ANKRUM. At all times relevant herein, Plaintiff was an "employee" within the meaning of NYSHRL and § 1981.

11)    Plaintiff, MAGGIE OLSEN, is a female citizen of Suffolk County, New York. At all times relevant, Plaintiff is employed by Defendant, RIVERHEAD CHARTER SCHOOL, under the direct supervision of her supervisor, Defendant, RAYMOND ANKRUM. At all times relevant herein, Plaintiff was an "employee" within the meaning of NYSHRL and § 1981.

12)    Plaintiff, BREANNA MCINTYRE, is a female citizen of Suffolk County, New York. At all times relevant, Plaintiff was employed by Defendant, RIVERHEAD CHARTER SCHOOL, under the direct supervision of her supervisor, Defendant, RAYMOND ANKRUM. At all times relevant herein, Plaintiff was an "employee" within the meaning of NYSHRL and § 1981.

13)    Plaintiff, SUZANNE CHIORANDO, is a female citizen of Orange County, Florida. At all times relevant, Plaintiff was employed by Defendant, RIVERHEAD CHARTER SCHOOL, under the direct supervision of her supervisor, Defendant, RAYMOND ANKRUM. At all times relevant herein, Plaintiff was an "employee" within the meaning of NYSHRL and § 1981.

14)    Upon information and belief, at all times relevant, Defendant RIVERHEAD CHARTER SCHOOL was and still is a domestic corporation, foreign corporation, or other legal entity duly organized and existing under and by virtue of the laws of the State of New York. Upon information and belief, RIVERHEAD CHARTER SCHOOL maintained a principal place of business in the County of Suffolk, and State of New York. Defendant RIVERHEAD CHARTER SCHOOL employed Plaintiffs at all relevant times. At all relevant times herein,

Defendant RIVERHEAD CHARTER SCHOOL is an "employer" and/or a "person" within the meaning of NYSHRL and § 1981.

15)   Upon information and belief, Defendant, RAYMOND ANKRUM, is a citizen of New York. Defendant, RAYMOND ANKRUM was at all times relevant to this matter an employee of Defendant, RIVERHEAD CHARTER SCHOOL, and/or was a "person" and/or an "agent" of Defendant, RIVERHEAD CHARTER SCHOOL, within the meaning of NYSHRL and § 1981. Defendant RAYMOND ANKRUM was at all times relevant to this matter Plaintiffs' supervisor and/or manager and was empowered by RIVERHEAD CHARTER SCHOOL as a distinct class of agent to make tangible economic decisions affecting the Plaintiffs.

16)   Each Defendant herein was acting as an employee and/or agent for each other Defendant herein and as such each is vicariously liable for the acts of others.

## FACTS COMMON TO EACH INDIVIDUAL CAUSE OF ACTION

17)   At all times relevant, Plaintiffs were employed by Defendant, RIVERHEAD CHARTER SCHOOL. Defendant, RAYMOND ANKRUM, was appointed the position of Principal in approximately August 2012. Defendant, RAYMOND ANKRUM, as such, was otherwise a "person" and/or an "agent" of Defendant, RIVERHEAD CHARTER SCHOOL, within the meaning of NYSHRL and § 1981. Defendant RAYMOND ANKRUM was at all times relevant to this matter Plaintiffs' supervisor and/or manager and was empowered by RIVERHEAD CHARTER SCHOOL as a distinct class of agent to make tangible economic decisions affecting the Plaintiffs.

18)   Shortly after Defendant, RAYMOND ANKRUM's (hereinafter, "MR. ANKRUM") hire, he began instituting changes within the Defendant, RIVERHEAD CHARTER SCHOOL, (hereinafter, "RCS" or the "School").

19)    MR. ANKRUM is an African-American male, known to be intelligent, calculated, and perpetrating an ostensibly noble agenda of improving minority education at RCS. In reality, MR. ANKRUM's agenda was the product of his racist, ageist, sexist, and other discriminatory beliefs. MR. ANKRUM illegally made these atrocious beliefs part of the terms of employment at Defendant, RIVERHEAD CHARTER SCHOOLS, in violation of NYSHRL and § 1981. MR. ANKRUM carried out this agenda to improve minority education by removing the Plaintiffs – the older, Caucasian, female teachers - from the school, and replacing them with younger teachers, whom he found attractive, and whom he could more easily manipulate into furthering his discriminatory agenda.    MR. ANKRUM's discrimination was directed at parents and students as well.

20)    MR. ANKRUM maintained a Twitter account, using the handle "@RayQRubio". Upon information and belief, MR. ANKRUM's Twitter account was deleted following the commencement of Complaints within the New York State Division of Human Rights in approximately 2014.

21)    Many of MR. ANKRUM's tweets are downright and arrogantly racist, promoting his own personal agenda to improve the lives of minorities. Of itself, one may say the strive for equality is certainly noble. However, MR. ANKRUM's tweets evince his tendency to, at best, generalize based on protected classes (race); form superficial, racially-charged and racially-based opinions; and his prejudicial belief that race, naturally or "nurturally", plays any role in a person's fundamental perceptions, abilities, thought processes, and the like. Further, MR. ANKRUM boldly and publicly conveys his distaste for Caucasians and whatever societal advantages may or may not exist for them.

22)   Examples of MR. ANKRUM's racist tweets under the Twitter user name "@RayQRubio" include: "@Dhdapostman @notcompton now it's time to pull out the black card"; "Ways to combat low T: #1. Date hot chicks. #2 Get an annual check-up #3. #Ting #4. Strip clubs & dollar bills"; "So it takes the #firstlady to attend a funeral to get investigators in #Chicago to care about black kids?"; "@Logicalhater @YoungMiddleEric dude, clearly race is playing a role in this. #dorner #lapd"; "I hate negro twitter. #theend"; "@QLegacy_Uplift gotta be the most ignorant self-hatred tweet I have ever seen. And you're a darkie…"; "**White male privilege is really something in the good ole United States #livestrong**" (emphasis added); "Sad that in 2013, Gifted + talented = separate + unequal http://shar.es/4DiEA via @JoanneLeeJacobs #diversity"; "W.E.B. Dubois was such a forward thinker. I wonder if he envisioned the state of the negro would forever be abysmal?"; "And every young black kid who exhibits anger or a lack of attention to your teaching is ADHD. #teachdontdiagnose"; "**@MoniseLSeward absolutely. But they never want to acknowledge that they suck as teachers and they can't make connections with black kids.**" (emphasis added); "**…coonedouttwitterbase**" (emphasis added); "**Is there an exclusive invitation to white twitter?**" (emphasis added); "**no way a black man would get the opportunity to explain his situation like this foolishness on #dateline**" (emphasis added); "**…so is RGIII an Uncle Tom or naa?**" (emphasis added); "**Rob Parker got a raw deal. RGIII is an Uncle Tom or naa?**" (emphasis added); "nigga said you use to have wild wrong dude sex…@MR845HIMSELF"; "Romney is #Mexican…"; and "#Mittprivilege". More specifically, MR. ANKRUM is of the belief that Caucasian teachers are innately unable to, and therefore should not, teach minority children.

23)     MR. ANKRUM's tweets also display arrogantly a deep-seated, albeit sometimes subtle, misogyny. MR. ANKRUM's tweets evince his tendency to, at best, generalize based on protected classes (gender/sex); form superficial, gender-charged and gender-based opinions; and his prejudicial belief that women, as a class of people, act with some degree of predictability and uniformity. He also boldly objectifies women, discussing his anatomical aesthetic preferences, his frequency of strip clubs, and various other degrading proclamations.

24)     Examples of MR. ANKRUM's discriminatory and misogynistic tweets under the Twitter user name "@RayQRubio" include: "…& light skinned ugly chicks are uglier than dark skinned ugly chicks.[1]"; "I'm moving to South Africa immediately bro. What in the Nike? What in the prosthetic is going on with the judicial system in SA?[2]"; "threesome?"; "Willing to wager an unattractive girl w/ a designer bag has better credit than an attractive girl w/ a designer bag."; "non attractive girls w/ designer bags present quite the conundrum"; "**…it's gone now. I likes me _____ nice & round, I likes me _____ to go up & down**" (emphasis added); "Ways to combat low T: #1. Date hot chicks. #2 Get an annual check-up #3. #Ting #4. Strip clubs & dollar bills"; "#ah is a size 2. #ak is teetering into double digits, size 9.5. Some say thick, I say cottage cheese"[3]; "…it all started with #RoyceWhite bro. You bone her raw, your iq is below 40."; "…Insecurity is a women's worst enemy…"[4]; "**Control-yo-hoes-you-let-her-talk-to-youcrazy-you-got-baby-mama-drama-you-aint-even-got-you-no-baby**"; "**Watching the Grammy's in 3d. Does jlo have the ill pouch or na? I'd still whip tho.**" "**use the kings' English when you address me woman**"; "**If I ever get married, I'm not using the excuse weddings are**

---

[1] Note this tweet reveals MR. ANKRUM's preference for darker-skinned women *and* reveals his discriminatory and misogynistic nature.
[2] a reference to MR. ANKRUM's apparent satisfaction the news of the day of February 22, 2013, that Oscar Pastorious, despite being charged with murder, was released on bail after shooting and killing a woman
[3] MR. ANKRUM's reference to women and their dress sizes. He refers to overweight women crudely as "cottage cheese."
[4] Referencing MR. ANKRUM's views as to how women *should* be.

expensive, I'll tell you I didn't want you there bc you suck as a person."; "& dudes if a woman is in an uproar when you say #prenup, it reinforces my theory that she's bringing nothing to the table. #run"; "& ladies when you find Mr. Right, your homegirls aren't happy for you. They want you to be divorced. #miserylovescompany"; "<u>More male educators are needed. #theend</u>"; "@LogicalHater we would've got whipped. @MarkDark2399 was bitching up…"; "…Philly strip clubs be having wild two for ones. I'm coming to bang w/ you… #soon b4 y'all go OD w/ this big 10."; "@_Thx4Playin@HotChoqlate don't feed the stray cats with compliments. They will never leave."; "Her: sex changes things. Me: Yep, for the better. Her: a-hole. Me: in your a-hole? No problem…Ha, I kill me. ~Alf."; and "She better take her as to Zumba today. Fdat bro." (emphasis added).

25)   More specifically, MR. ANKRUM believes that female teachers are ineffective.

26)   Quite disturbingly and alarmingly, MR. ANKRUM boldly proclaims on Twitter "**More male educators are needed. #theend**" (emphasis added).

27)   In addition to his racist and misogynistic rhetoric, MR. ANKRUM is prone to homophobic slurs as well. Examples of MR. ANKRUM's discriminatory and misogynistic tweets under the Twitter user name "@RayQRubio" include: "Miles Austin is either on peds, or he's a faggot…".

28)   MR. ANKRUM is proud of his intelligence, noting often that his tweets tend to be "over [other users'] heads". Further, he tweets with a stubborn arrogance and narcissism that, together with his repeated announcements of his educated status, evinces MR. ANKRUM's tendency to act in a calculated manner. Examples of MR. ANKRUM's discriminatory and misogynistic tweets under the Twitter user name "@RayQRubio" include: '…yes, but I

graduated from stony brook, have an ivy league Ed.M, and I'm in a top 50 doctoral program. How dare you dude?"; "I would like to thank the tier 1 universities that I have attended for teaching me how to speak…"; "bro, I am the team. I don't need to acclimate to the bs."; "I· will not dumb down my tweets for you minions."; "…Nelson please, you're a journeyman, you'll never outwit me bro. I don't take your kind serious…"; **"I have to limit who has access to my brilliance."** (emphasis added); "I realize my tweets go way over the heads of most, it's fine, you can thank me when you get it. Could be months, even years."; and "I hate dumb people. People who ride the "Jerry Buss" or is it the "yellow bus", either way you're an idiot".

29) Shortly after MR. ANKRUM's hire, in approximately August 2012 at a "Back to School Barbecue," MR. ANKRUM had a conversation with a very-well-liked social worker at the school named Lacey Branker (hereinafter, "Ms. Branker"). Ms. Branker and MR. ANKRUM had a discussion in which MR. ANKRUM asked Ms. Branker what her opinion was of MR. ANKRUM. Ms. Branker indicated that she had only recently met him and was not sure. MR. ANKRUM replied "I know, I'm an asshole. I own it." Ms. Branker was unsure how to respond, but replied, "I guess that's true."

30) Shortly thereafter, MR. ANKRUM held a staff meeting in which he indicated that he "feels like a minority" because he "inherited" an "all-white staff." Immediately upon MR. ANKRUM's hire, Caucasian Plaintiffs learned there would be a tension between them and MR. ANKRUM based upon their race.

31) Early into MR. ANKRUM's hire, he was noted to make statements such as "we need new blood around here," "the old guard needs to change," "we need more color in the building," "I feel like a minority here," "we need more males here," "we need more black males here."

32)    In approximately September/October of 2012, there was a meeting of the Student Support Team in the Board Room. During the meeting, criticisms of MR. ANKRUM's new regime were discussed. One of the criticisms with MR. ANKRUM was that teachers were made to feel uncomfortable that he often requested that they "write up" untrue things about students.

33)    Following the meeting, MR. ANKRUM exclaimed toward Ms. Branker, "I HATE THIS FUCKING SCHOOL! I CAN'T WAIT UNTIL NEXT YEAR, I'M HIRING ALL YOUNG, SKINNY GIRLS WITH SHORT DRESSES." Ms. Branker said to MR. ANKRUM, "I guess I won't make the cut, then?" MR. ANKRUM said, "I'll leave that up to you to figure out."

34)    On one occasion, there was a handicapped Caucasian child having difficulty in school. Ms. Branker, as the social worker, discussed the child with MR. ANKRUM. MR. ANKRUM wanted the child out of the school. Ms. Branker wanted to help the child. MR. ANKRUM stated, "I'm not feeding into his disability. I'm not having a school full of freaks." Ms. Branker was extremely disturbed by MR. ANKRUM's discrimination.

35)    On another occasion, there was a situation involving a Caucasian woman with an adopted African-American daughter. MR. ANKRUM was disturbed by a Caucasian woman attempting to raise an African-American child. The child suffered from anxiety. In a meeting with the mother, MR. ANKRUM told her that she was a "poor parent" and that she "should not have children." MR. ANKRUM's distasteful words were motivated by his racist beliefs.

36)    On another occasion, a Caucasian student was complaining of being bullied by two African-American students. MR. ANKRUM was known to be friends with the African-American mother of the two African-American children. The teacher of the children corroborated the story, and confirmed that the Caucasian girl was being bullied by the two African-American students. MR. ANKRUM tried to sweep the incident under the rug. MR.

ANKRUM ordered the teacher to modify her report to indicate that the two African-American children were being bullied by the Caucasian student. The teacher was appalled and refused to be a part of such a fabrication. Again, MR. ANKRUM's actions were motivated by his racist beliefs and his attempts to protect the African-American children in a discriminatory manner over the Caucasian children.

37)    On another occasion, a teacher was reporting the repeated absences of two African-American children. Upon information and belief, MR. ANKRUM modified the attendance reports of these children in order to indicate that their absences were excused. MR. ANKRUM's actions were motivated by his racist beliefs and his attempts to protect African-American children in a discriminatory manner over the Caucasian children.

38)    On another occasion, MR. ANKRUM allowed a particular student to go without mandated special-education services without the consent of the parent. MR. ANKRUM wanted this particular student out of RCS. The child's teacher, Mr. Raymond Patuano, was aware of MR. ANKRUM's determination to rid the school of this child. MR. ANKRUM and Mr. Davidson told Mr. Patuano to "do whatever you can to get [the child] out" and "do whatever you can to 'set [the child] off'". "Set him off" referred to MR. ANKRUM and Mr. Davidson instructing Mr. Patuano to attempt to intentionally trigger the child's behavioral disorders. MR. ANKRUM said to Mr. Patuano, "you have my full support". MR. ANKRUM stated that he was trying to create a paper trail of behavioral incidents in order to justify the child's removal from the school. Mr. Patuano was shocked at the nefarious nature of such an order and declined to treat the student in this way.

39)    On numerous occasions, Ms. Branker had conversations with Mr. Eric Davidson, in which Mr. Davidson said "MR. ANKRUM wants more black people here."

40)    In approximately September 2012, David Slover, an administrator, and Ms. Branker were standing in the parking lot with MR. ANKRUM when a Caucasian parent with an Autistic child walked near them. MR. ANKRUM explained to Mr. Slover and Ms. Branker, "my biggest issue with this school is that parents with disabled kids continue to procreate." Ms. Branker responded to MR. ANKRUM by stating "I can't believe you would say something like that." MR. ANKRUM appeared very agitated by the fact that Plaintiff did not agree with his unfairly prejudicial and discriminatory beliefs. MR. ANKRUM appeared to be "out to get" Ms. Branker after this day. When Mr. Slover tried to stand up for and/or defend Ms. Branker to MR. ANKRUM, MR. ANKRUM became agitated with Mr. Slover.

41)    MR. ANKRUM also stated "another problem is that parents should not be having kids after a certain age." Plaintiffs learned very early into MR. ANKRUM's hire that he was against Caucasians, Caucasians with disabilities, and older people. Shockingly, MR. ANKRUM's feelings spread to the children, and not just the Plaintiff-employees.

42)    In approximately October 2012, Mr. Slover heard MR. ANKRUM on the phone on the porch to the Kindergarten-third grade building during school hours. Mr. Slover heard MR. ANKRUM saying "my professional advice to you is; keep yo [sic] dick out dat [sic] pussy. You asked my advice and that's my professional advice. Keep yo [sic] dick out dat [sic] pussy." Plaintiff was surprised that the Principal of an elementary school would use that kind of language, and was even more surprised that he would do so in the earshot of the children.

43)    In approximately December of 2012, RCS held a Saturday "retreat" for all staff members. A "facilitator" led the retreat. In the second half of the day, the facilitator asked everyone about whether they had any issues with the board and the administration. The retreat was supposed to be geared towards helping the school "move forward." The room was very

quiet. Mr. Slover, acknowledging the fact that the staff might be reluctant to speak up with the administration in the room, suggested that the Board and the Administration, including Mr. Slover, step out of the room to allow for the free exchange of ideas and constructive criticism from the staff. MR. ANKRUM was visibly upset by this suggestion and left the room in an agitated manner. A few hours later, Mr. Slover received a call from MR. ANKRUM, in which MR. ANKRUM stated "How the hell do I not take this personally?" MR. ANKRUM could not understand how Mr. Slover did not take offense to it himself. Mr. Slover stated that change is a process and that this was best for the school. MR. ANKRUM stated that he would have to think about it and calm himself down.

44)     Ms. Branker, along with other Plaintiffs, was very vocal during this retreat. She explained to the facilitator that she found MR. ANKRUM to commonly use physical intimidation tactics. She complained that MR. ANKRUM was very calculated in the way he held teacher's jobs over their heads. He prayed on the teachers that were going through difficult times and desperately needed their jobs. He used these weaknesses in order to secure their alliances with him. Ms. Branker also complained that MR. ANKRUM was decidedly unfair to children with disabilities. Ms. Branker complained of discrimination, including disparate treatment of Caucasians and African-Americans, and a hostile work environment caused by severe and pervasive sexual harassment and unlawful discrimination and retaliation.

45)     Within a few minutes after the retreat was finished, Mr. Slover began receiving telephone calls from team leaders that were upset. The team leaders stated that MR. ANKRUM called threatening them that their jobs would be in jeopardy if they did not inform him as to what criticisms were lodged at the retreat.

46)    Approximately that following Monday, MR. ANKRUM entered a "workout" at RCS and stated to all the teachers and staff present: "Anybody who doesn't want to work here can get the hell up on outta [sic] here". He stated that if he found out who was saying negative things, he would "make their lives a 'living HELL'" with great emphasis on the word "hell."

47)    Following the retreat, MR. ANKRUM found out that Ms. Branker was complaining about his illegal employment activities. MR. ANKRUM also learned that another teacher, Ms. Mary Ellen Weaver (hereinafter, "Ms. Weaver"), was in agreement with Ms. Branker's complaints. He retaliated against them by "setting up a new office" immediately outside the classroom that Ms. Weaver and Ms. Branker used. MR. ANKRUM told Ms. Branker, "I can't trust you because you're talking bad about me." MR. ANKRUM told Ms. Branker, "I'll get rid of you first before you get rid of me." MR. ANKRUM used this second "office" as a means by which to antagonize, menace, and intimidate Ms. Branker and Ms. Weaver in retaliation for their objections to his illegal employment practices.

48)    In approximately November/December 2012, Mr. Slover took a short leave in order to travel to Nebraska to donate bone marrow to his ailing sister, who was suffering from leukemia. Due to physical, emotional, and mental exhaustion following taking the long trip to donate bone marrow to his sister, Mr. Slover was unable to attend the RCS holiday concert upon his return.

49)    Shortly thereafter, Mr. Slover received an email from MR. ANKRUM stating that he was "missed immensely" at the concert. He expressed disappointment that Mr. Slover failed to "give notice" that he was not attending the concert. Meanwhlie, Mr. Slover had informed MR. ANKRUM's secretary via email that he was not going.

50)     MR. ANKRUM fabricated a pretextual paper trail by then stating that Mr. Slover's "relationship" with Ms. Branker "doesn't allow you the flexibility to properly manager her." MR. ANKRUM then referred to Ms. Branker as a "superstar" due to some purported "collaboration" with Mr. Eric Davidson that took place in Mr. Slover's absence. Shortly thereafter, Mr. Slover was demoted and Mr. Davidson was promoted to Dean of Students of Kindergarten through Third Grade. MR. ANKRUM's entire course of action here was a calculated plan to legitimize the promotion of Mr. Eric Davidson, an otherwise unqualified and poor candidate, to the position of Dean, and substantiate the otherwise inexplicable demotion of the well-qualified and effective Mr. Slover.

51)     In approximately January 2013, during a Professional Development seminar, the "Positive Behavior Support" team, or "PBS" for short, presented a training lesson to the staff. The topics of the training lesson included emergency-action plans, per New York State mandate, relating to fire evacuation, campus evacuation, code red/active shooter on campus, tornado/hazardous weather procedures, and more. Throughout the training, Mr. Davidson was on his cell phone, texting, and not paying attention. Plaintiffs observed that Mr. Davidson was texting MR. ANKRUM during this time. MR. ANKRUM and Mr. Davidson spent most of the training exchanging sophomoric, dirty acronyms for the acronym "PBS". No discipline was levied against Mr. Davidson or MR. ANKRUM for their use of a cell phone during these important meetings.

52)     In approximately February 2013, Mr. Slover asked MR. ANKRUM what his role was in light of the recent demotion, promotion of Mr. Davidson, and other changes going on. MR. ANKRUM responded "I'm not sure. Michelle is going to write down what she thinks her responsibilities should be and then I'll let you know." MR. ANKRUM then told Mr. Slover that

he was "pissed off" at him for "not being proactive enough" in stopping the "negativity" among the staff members. Illegally, MR. ANKRUM wanted Mr. Slover to retaliate against those that disagreed with MR. ANKRUM's illegal employment practices. Mr. Slover refused to be one of MR. ANKRUM's pawns in his discriminatory agenda and was retaliated against as a result.

53) That afternoon, Mr. Slover, MR. ANKRUM, and Mr. Davidson observed two demo lessons. During the entire lesson, MR. ANKRUM and Mr. Davidson were on their cell phones sending text message and/or browsing the internet. No discipline was levied upon MR. ANKRUM or Mr. Davidson for their improper use of their cell phones.

54) Subsequently, another candidate was interviewed by Mr. Slover, MR. ANKRUM, and Mr. Davidson. MR. ANKRUM and Mr. Davidson spent the better part of the interview arguing over whether Batman was a "superhero or vigilante". During an earlier interview in which MR. ANKRUM was not present, Mr. Davidson asked zero questions of the candidate, which was clearly reflective of his lack of experience and knowledge. Mr. Slover was embarrassed to be associated with two "administrators" acting so unprofessionally and representing RCS so poorly.

55) In approximately April 2013, Ms. Mary Ellen Weaver wrote a letter to the Board of Trustees outlining MR. ANKRUM's various violations of law, RCS policy and protocols, the Collective Bargaining Agreement, and also complained of unlawful discrimination and harassment.

56) In approximately May 2013, most teachers received letters from the school outlining their employment for the following year. Ms. Mary Ellen Weaver did not receive any such letter at the same time as all of her colleagues. After a few days, she followed up with RCS to inquire as to why she had not yet received her letter. Shortly thereafter, MR. ANKRUM wrote

Ms. Mary Ellen Weaver an email stating, inter alia "Several letters were submitted to the board highlighting improprieties at RCS. These letters must be investigated thoroughly, before any decision regarding your employment is rendered."  MR. ANKRUM's reply, together with the harassment, hostile work environment, intimidation, and retaliation that Ms. Mary Ellen Weaver suffered throughout her employment at RCS, caused her such extreme stress and anxiety that she went to the doctor. She was advised by her physician not to return to work for 48 hours. Shortly thereafter, Ms. Mary Ellen Weaver determined the stress and the hostile work environment were too much for her to bear, and she was left with no choice but to leave employment at RCS.

57)    In approximately April 2013, MR. ANKRUM violated numerous protocols pertaining to state testing, including late commencement of the exams and his failure to show up for school to administer the exams.

58)    On numerous occasions, Mr. Davidson and MR. ANKRUM were noted to leave the school without informing anyone or giving notice as to when they would return. They were commonly observed to act in a childish and "frat boy" mentality.

59)    As a fellow administrator, Mr. Slover had numerous conversations with MR. ANKRUM in which MR. ANKRUM indicated that the "union was a pain" and that he "did not want to have to deal with the union" when it came to getting rid of the teachers that MR. ANKRUM wanted to get rid of. Mr. Slover also had numerous conversations with MR. ANKRUM in which MR. ANKRUM indicated that, if he wanted to get rid of someone, "all he had to do was just create a negative evaluation for them and refuse to renew their contract."

60)    Many Plaintiffs were members of New York State United Teachers (hereinafter "the Union"). Shortly after his hire, MR. ANKRUM commenced a plan to disband the Union in order to rid the school of Caucasian, older, female teachers. MR. ANKRUM understood the

Union provided certain protections to its members. MR. ANKRUM understood that the teachers that were willing to speak up to protect their rights with the Union were the older, Caucasian, women. MR. ANKRUM understood that in order to rid the school of the older, Caucasian, female teachers, he needed to disband the Union. MR. ANKRUM actively campaigned privately and in a calculated manner to deter support for the Union and encourage people to join "his side". He openly and arrogantly expressed his opinion that the Collective Bargaining Agreement (hereinafter, "CBA") could not stop him and "could not save anyone's job".

61)     Following a Union rally, MR. ANKRUM spoke with Plaintiffs, and outwardly dismissed the cause behind the rally because "there were not even that many minorities" rallying.

62)     It was well known amongst employees of RIVERHEAD CHARTER SCHOOL that MR. ANKRUM was vindictive, vengeful, and retaliatory. He created a hostile work environment wherein employees were afraid for their jobs, and even their safety, if they disagreed with him. In acting in such a vengeful, vindictive, and retaliatory manner, MR. ANKRUM proudly discouraged objection to his discriminatory actions and his illegal agendas. He acted with intent to put fear in anyone that voiced their objection to his opinion, or supported those that disagreed with him.

63)     MR. ANKRUM actively sought to create alliances with groups of individuals to create artificial support for his agenda to rid the school of Caucasian, older, female teachers. Similarly, he actively campaigned to break those "alliances," or, as Plaintiffs would call them, "friendships," between those whom MR. ANKRUM believed were against him. Teachers that refused to ally with MR. ANKRUM, objected to MR. ANKRUM's discriminatory acts, and/or supported those teachers whom MR. ANKRUM discriminated against, were retaliated against in the form of calculated and premeditated demotions, increased supervisions and evaluations,

artificial negative paper trails, termination from employment, and more. He was nasty. He instilled fear – over both Plaintiffs' continued employment and for their physical safety. He was physically aggressive. He tended to be at his worst behind closed doors. Yet, he had a sociopathic ability to create the appearance of propriety when he believed he could be found out. MR. ANKRUM believed he could escape or circumvent liability or wrongdoing by "declining to renew" a teacher's contract as opposed to "firing" them.

64)    Despite years of positive evaluations, positive parent reviews, positive student reviews, and general respect of their peers prior to MR. ANKRUM's employment, Plaintiffs learned quickly into MR. ANKRUM's employment that they were the subject of his discriminatory agenda. MR. ANKRUM manufactured negative performance reviews and even fabricated stories to form pretexts to adverse tangible employment action taken against Plaintiffs. Plaintiffs' relationship with MR. ANKRUM was often negative and hostile. He appeared to be "out to get" the Plaintiffs.

65)    MR. ANKRUM routinely informed the teachers that Caucasians are, because of the color of their skin, innately unable to relate to African-American students. In addition to insulting, racist, and discriminatory, Plaintiffs found this to be surprising, as they had routinely taught children of all backgrounds and races without issue in the past.

66)    In approximately August of 2013, MR. ANKRUM held a seminar before all teachers, including Plaintiffs, in which he brought in a Caucasian teacher from another school to teach the "White Teachers" "how to teach black students". MR. ANKRUM introduced this woman as "white chocolate". MR. ANKRUM was friendly with this woman. She appeared to have MR. ANKRUM's respect. This teacher was Caucasian and revealed that she was dating an African-American man, and that was the reason that MR. ANKRUM referred to her as "white

chocolate," which name Plaintiffs learned was a crude reference to skin tones.  MR. ANKRUM was sending a message that Caucasian women should have sex with African-American men in order to gain his, and African-American men's, respect. MR. ANKRUM was also sending a message that, in order to better understand the black students, the women should have sex with an African-American man. Plaintiffs were made to feel discriminated against, sexually harassed, and uncomfortable by this message.

      67)    Plaintiffs had years of experience teaching students of all different backgrounds. Plaintiffs cared about their jobs, and cared deeply about each and every one of their students' successes, regardless of each student's race. Yet, MR. ANKRUM often made racist remarks such as "if you are not black you cannot understand these children" and "if you are not black you cannot connect with these children." In "Professional Development" seminars, MR. ANKRUM spoke in a demeaning manner of the "White silver spooners". MR. ANKRUM spoke often of his devotion and passion for "minority education and educational equality". In the course of his agenda, MR. ANKRUM conflated and equivocated "underprivileged" students with "minority" students.

      68)    In another seminar, MR. ANKRUM separated the teachers at RCS, including Plaintiffs, into three groups: "low-," "mid-," and "high-" socioeconomic statuses. In order to determine the group in which each Plaintiff belonged, MR. ANKRUM asked the teachers, in front of the entire group, the name of the town in which each teacher grew up. MR. ANKRUM then used his generalized perception of the socioeconomic status of that town and assigned each teacher to one of the groups. MR. ANKRUM referred to the "High" class as "White silver spooners". Plaintiffs were made to feel uncomfortable as they were forced to discuss the "advantages and disadvantages" of their childhoods. MR. ANKRUM then associated the

"advantages and disadvantages" of each teacher's childhood with their race and socioeconomic status. MR. ANKRUM also unfairly generalized that those from the "Higher" socioeconomic upbringings were automatically "White," and those from the "lower" socioeconomic upbringing were automatically "black". MR. ANKRUM revealed his distaste and his prejudice for the "White silver spooners" as he explained his opinions that "White silver spooners" have/had more societal advantages than "blacks," and, as such, were the subject of his scorn. MR. ANKRUM also discussed the "White Privilege" and his discomfort with same.

69)     Plaintiffs believed they were being judged by their race, discriminated against, and were made to feel uncomfortable as a result. Unequivocally, each Plaintiff, regardless of their upbringing or socioeconomic background, approaches/approached each student with the same amount of love, compassion, tolerance, and equality in their quest to shape their minds and further their education at RCS.

70)     MR. ANKRUM, in a calculated manner, would hire younger teachers and indoctrinate them with his beliefs that the Union should not exist. He would go so far as to make the newly-hired, younger teachers promise that they would disband the Union. Again, MR. ANKRUM viewed the Union as an obstacle to his discriminatory agenda, because it gave the Plaintiffs additional protections. The younger teachers, happy to have a job and not looking to disturb or upset their boss and new employer, obliged. Older and more experienced teachers, namely Plaintiffs, were more understanding of their rights and tended to speak out in enforcement of same. They spoke out in objection to MR. ANKRUM's illegal employment practices. MR. ANKRUM was determined to rid RCS of these teachers.

71)     In approximately December 2013, during a "Professional Development" seminar, MR. ANKRUM separated the older staff from the younger staff and asked questions as to

whether they were Union supporters. MR. ANKRUM commonly referred to the older staff as "veterans". He used the term "veteran" in a demeaning, insulting, and negative manner in order to convey his views that older teachers were "archaic," "old-fashioned," "antiquated," "from the same decade as his mother," and the like. MR. ANKRUM conveyed that "veterans" were the problem with RCS, and should not be employed by RCS. Once he separated the "veterans" from the younger teachers, it was easier for him to decipher specifically which of the older teachers were Union supporters.

72)     At this Professional Development seminar, most teachers indicated their support for the Union. MR. ANKRUM threatened during this seminar: "For any star teachers looking for jobs during the Christmas break, you should know that if I want to find a reason to fire you, I will fire you and the CBA will allow me to do so." Again, MR. ANKRUM used threats of termination to dissuade objection to his discriminatory agenda. Meanwhile, he was alienating the older "veteran" teachers from the younger. Plaintiffs were made to feel uncomfortable by MR. ANKRUM's actions and felt discriminated against as a result. Also, by articulating his views so publicly, MR. ANKRUM furthered a culture and atmosphere of fear whereby Plaintiffs grew concerned as to which teachers were "safe" to befriend in MR. ANKRUM's eyes. Where Plaintiffs befriended the "wrong" people at RCS, MR. ANKRUM let them know. He told them to "change who you have lunch with," and even went so far as to attempt to dictate who each Plaintiff could socialize with after hours. MR. ANKRUM used these socializing rules to attempt to retaliate against Plaintiffs by alienating those that disagreed with him. Where Plaintiffs did not follow MR. ANKRUM's socializing rules, they were retaliated against as well.

73)     MR. ANKRUM often made discriminatory remarks to the older teachers. During the implementation of a new computer program, most teachers at the school were having trouble

acclimating to same. When it came to the Plaintiffs' difficulties with the new program, MR. ANKRUM made comments such as "you are technologically challenged", you are "inflexible", "you are antiquated," "you are old school," and "you are old-fashioned". Where younger teachers had problems with the new program, he did not criticize them and did not make them feel inferior. In the case of the Plaintiffs, MR. ANKRUM associated causally their age with their difficulties with the new program. MR. ANKRUM referred to older teachers' teaching degrees as "dinosaur certificates". MR. ANKRUM criticized older teachers and advised them to listen to the younger teachers because their "ideas were younger".

74)     MR. ANKRUM was/is manipulative. MR. ANKRUM believed he could cover up his discriminatory agenda by creating paper trails in the form of poor performance evaluations and supposed complaints. MR. ANKRUM used the "teacher evaluation" as a bullying measure to intimidate teachers. His surprise evaluations were performed in neither the best interest of the teacher, nor the student, nor the school. Rather, he used the performance evaluation as a means by which to create a superficial pretext for his discriminatory firings.

75)     MR. ANKRUM acted in a calculated manner to attempt to protect himself from complaints of discrimination. Despite his agenda to "bust" the Union in order to rid the RCS of the older, female, Caucasian teachers, he ultimately believed the Union was "useless" because, "if he wanted to fire someone, in the worst case scenario, he could just wait until the end of the year to do so."

76)     MR. ANKRUM, believed to be of Christian faith, expressed distaste for non-Christians, and actions/beliefs that were not in accordance with the Christian faith. For example, Plaintiff JACLYN SCOGLIO divorced her husband during her employ at RCS. MR. ANKRUM indicated to her that he was disappointed that she was getting divorced, because "it was

important for students to be taught by members of nuclear families and that being divorced negatively affected her teaching ability." Days after informing of her divorce, Plaintiff JACLYN SCOGLIO was placed on an "improvement plan," despite recently receiving a stellar performance review.

77)     Plaintiff FARAH MARTIN, was terminated because a news article surfaced regarding her custody battle and divorce with her same-sex partner. MR. ANKRUM emailed the news article around the school to many teachers. Soon thereafter, Plaintiff FARAH MARTIN was terminated in an act of discrimination for the fact that she was discovered to be a lesbian and because that did not comport with MR. ANKRUM's close-minded beliefs. Prior to MR. ANKRUM's discovery that Plaintiff FARAH MARTIN was lesbian, Plaintiff FARAH MARTIN received stellar performance reviews. It was only immediately following MR. ANKRUM's discovery that Plaintiff FARAH MARTIN was lesbian that any negative performance evaluation surfaced. She was terminated shortly thereafter.

78)     Jewish Plaintiffs, FARAH MARTIN, ANDREA VAN EPPS, and SHERRIE ORESTIS suffered consistent snide remarks about their Jewish faith from MR. ANKRUM. Their requests for him to cease such discriminatory comments were either ignored or withheld due to fear that he would grow worse and retaliate.

79)     MR. ANKRUM hired his, upon information and belief, friend and college roommate, Mr. Davidson. Upon information and belief, Mr. Davidson had virtually no experience and no teaching certification at the time. Upon information and belief, Mr. Davidson "identifies as Black," yet MR. ANKRUM refers to him as "White Boy E E".

80)     MR. ANKRUM appointed Mr. Davidson, his male friend, to be a co-teacher in a classroom with Plaintiff JACLYN SCOGLIO. Mr. Davidson frequently spent class time on his

cell phone, on his computer doing work for his private business, while Plaintiff JACLYN SCOGLIO did all the teaching, planning, and grading. Yet, Mr. Davidson informed her that he and MR. ANKRUM had daily conversations about who MR. ANKRUM was going to fire, creating a constant state of fear and intimidation. Plaintiffs received harsh scrutiny for the slightest missteps. MR. ANKRUM turned the smallest issues into supposed bases for termination. Yet, MR. ANKRUM's ally, his male friend who "identifies as black," was not subjected to the same criticism and was essentially allowed to do as he pleased, regardless of whether the rules required otherwise.

81) MR. ANKRUM sexually harassed the staff. He favored younger women employees, whom he believed to be attractive. Plaintiffs were not the subject of his sexual attraction, and were made to feel of lesser importance and worth at the school because of it. When female Plaintiffs wore skirts that were below the knee, MR. ANKRUM criticized them for "dressing like a nun." Female employees that dressed provocatively were treated as friends, subjected to less-stringent applications of the rules, and generally allowed to break rules. Meanwhile, Plaintiffs were terminated for less. Female Plaintiffs were made to feel objectified and sexually harassed by MR. ANKRUM's actions.

82) MR. ANKRUM also showed preferences for younger women whom MR. ANKRUM found to be attractive. It was widely known that MR. ANKRUM maintained a "hot list" of teachers MR. ANKRUM believed to be attractive and with whom MR. ANKRUM would like to have sex. It was also understood that MR. ANKRUM and Mr. Davidson watched pornography together in the Dean's Office, even where a young student was nearby.

83) MR. ANKRUM openly joked about overweight teachers' weight in front of other teachers. The teachers that heard these jokes were insulted, and hurt for the other teachers.

Again, there was often too much fear to object, as those who objected in the past were dealt harsh retaliation. MR. ANKRUM thereby perpetuated a culture of "fat-shaming" and furthered the culture that the "hot list" teachers to whom MR. ANKRUM was attracted were of a higher value than others.

84)     Teachers that were younger than Plaintiffs, and who dressed more provocatively than Plaintiffs, were not subjected to the same harsh criticism as Plaintiffs. Upon information and belief, one teacher, Ms. Lisa Marchese, was openly involved in a sexual relationship with MR. ANKRUM's right-hand man, Mr. Davidson. In exchange, that young teacher was treated differently than the other teachers. Ms. Marchese, as a reward for her sexual relationship with MR. ANKRUM's friend, was allowed to sit casually on tables during staff meetings, while Plaintiffs and other teachers were required to sit professionally in chairs. This young teacher was allowed to walk in and out of professional development meetings at her leisure, where Plaintiffs and other teachers were subjected to scorn for the same actions. This young teacher was allowed to use her cell phone during professional development meetings, where Plaintiffs and other teachers were admonished for same. This young teacher often would change into revealing and provocative workout gear at the close of the school day and then leave with MR. ANKRUM and Mr. Davidson to go work out at Mr. Davidson's gym. This young teacher was allowed to use her cell phone during class, whereas Plaintiff JACLYN SCOGLIO was ultimately terminated for a fabricated complaint of cell phone use during class. This young teacher was provided special exceptions, while Plaintiffs were not. This created the belief in the teachers that, in order to be on MR. ANKRUM's good side, you had to either sleep with him or his right-hand man, Mr. Davidson.

85)     Shortly after the December 2013 Professional Development seminar, Plaintiff JACLYN SCOGLIO, one of the "veterans" that spoke out in objection to MR. ANKRUM's and RCS's illegal employment practices, was terminated for a pretextual reason, namely "utilization of a cell phone during class." Defendants relied on an awfully suspect basis for her termination, especially considering the fact that Plaintiff JACLYN SCOGLIO had received numerous accolades for her teaching successes at RCS.

86)     Plaintiff JACLYN SCOGLIO became one of the first in a line of firings of the older, Caucasian, female teachers. Plaintiffs existed in a constant state of fear over their jobs. MR. ANKRUM threatened the Plaintiffs that their support of JACLYN SCOGLIO would not be allowed. MR. ANKRUM, in the course of his discriminatory agenda, was determined to snuff any defectors and objections to his ways.

87)     As another retaliatory vehicle, MR. ANKRUM used "prep times" against complaining Plaintiffs. Teachers used "prep times" to prepare for their classes through out the day. Where teachers complained, MR. ANKRUM disciplined them by taking away "prep times."

88)     In fact, through the date of the filing of this lawsuit, many potential Plaintiffs are afraid to reveal their objections to MR. ANKRUM's illegal employment practices because they fear retaliation, ranging from adverse employment action to actual bodily harm, from MR. ANKRUM.

89)     Upon information and belief, in a further calculated plan to gain the favor of the Board of Trustees of the School, it is believed that MR. ANKRUM has a special and/or sexual relationship with the President of the RCS Board of Trustees, Ms. Zenobia Hartfield. This relationship is widely known amongst the faculty. Ms. Hartfield's relationship with MR. ANKRUM further created the hostile work environment, as Plaintiffs knew that objections and

complaints regarding MR. ANKRUM would be futile because Ms. Hartfield would be in favor of her friend, MR. ANKRUM.

90)    Another member of the RCS Board of Trustees, Ms. Joy Rankin, has been accused of similar racial discrimination in her position as Director of the Riverhead Free Library. Upon information and belief, she has a matter pending before the New York State Division of Human Rights for similar racial discrimination as is alleged in the instant complaint.

91)    MR. ANKRUM was also known to discriminate against the children as well for their race and their disabilities.   Where African-American students were diagnosed with disabilities, MR. ANKRUM embraced them and treated their needs with compassion. Where non-African-American children had special needs MR. ANKRUM made fun of them, criticized them, ignored their needs, and more. As it pertains to one six-year-old student, a child that cried in school often and needed a lot of extra attention, MR. ANKRUM was known to call him an "asshole." SHERRIE ORESTIS witnessed MR. ANKRUM call the boy an "asshole" to the child's face. SHERRIE ORESTIS, in sheer and utter shock, asked MR. ANKRUM "how could you say such a thing?" MR. ANKRUM replied "What can [the student] even do about it?" This was yet another example of MR. ANKRUM's distaste for and discrimination of disabled individuals and disparate treatment of Caucasian and African-American individuals and contributed to the hostile work environment Plaintiffs suffered. MR. ANKRUM's conduct in this regard corroborated and confirmed the discrimination, harassment, and disparate treatment suffered by the Plaintiffs as employees.

92)    On another occasion, Plaintiffs witnessed MR. ANKRUM forcing a parent to place her child on medication. Despite the fact that some Plaintiffs had professional degrees and

disagreed with the decision, MR. ANKRUM told the parent that if the parent did not have her child placed on medication, that the child would be kicked out of the school.

93)     MR. ANKRUM did not express much concern for following state laws pertaining to Special Education Services, inclusion/collaborative classrooms, and students' IEPs. Very often, classrooms that required two teachers by law were left to be taught by one teacher. Despite being confronted with these issues, MR. ANKRUM ignored the issues and forced the classrooms to be taught illegally by only one teacher. When it came time to mark the attendance records, MR. ANKRUM forced the Plaintiffs to mark the attendance cards as though services were being properly rendered. Plaintiffs confronted either MR. ANKRUM, or then-Dean Mr. Davidson with these issues, requesting substitutes and and/or the required level supervision/instruction. MR. ANKRUM and RCS were well aware of the non-compliance issues.

94)     In approximately Spring 2014, MR. ANKRUM terminated the 5th-8th grade ESL teacher. Subsequently, Defendants allowed the ESL students to spend the last two months of school without an ESL teacher. Such was further evidence of RCS's and MR. ANKRUM's lack of concern for the laws of this state and exacerbated the hostile work environment felt by the Plaintiffs. Plaintiffs continued to exist in fear as they learned there was nothing they could do to stop the illegal ways of the Defendants.

95)     RCS granted MR. ANKRUM virtually unchecked authority to turn RCS into his personal sociological race experiment whereby he vilified and attempted to create racists out of good-hearted, loving, tolerant accepting Plaintiffs herein. Their only "crime" was being of the wrong race, wrong gender, wrong sexual orientation, and wrong religion, in MR. ANKRUM's eyes, and for standing up for their rights under the laws of the State of New York and under the laws of the United States of America. Even after numerous complaints, New York State Division

of Human Rights complaints, Union complaints, Union rallies, RCS failed to take this matter seriously. RCS's failure to act to date has been none other than a ratification and condonation of the illegal agenda perpetrated by MR. ANKRUM. In fact, of the date of the original filing of the Summons and Complaint, August 7, 2015, MR. ANKRUM continues to rule the school with impunity.

96)     Following the filing of the Summons and Complaint, the Defendants, by their attorneys, retaliated against the Plaintiffs by using the media as a voice through which to express mockery, intimidate other current RCS employees from filing further complaints, discourage the filing of further complaints, and attempt to silence any further exercise of Plaintiffs' and potential Plaintiffs' rights under state and federal law. Defendants, by their attorneys, mockingly dismissed the Plaintiffs' complaints, referring to them as "light summer reading," and referring to the Plaintiffs' allegations as "a good fiction novel."

97)     The allegations of fact contained in this Complaint are common knowledge to all Plaintiffs, and each allegation directly contributes to each individual Plaintiff's claim of a hostile work environment and illegal employment practices.

## FURTHER SPECIFIED ALLEGATIONS
## AS TO PLAINTIFF, JACLYN SCOGLIO

98)     Plaintiff, JACLYN SCOGLIO, hereby repeats, realleges, and reiterates Paragraphs 1-97 as though fully set forth herein.

99)     Plaintiff, JACLYN SCOGLIO (hereinafter, "MS. SCOGLIO") is a now-divorced Caucasian woman, who began working at RCS in 2007. Prior to MR. ANKRUM's hire, MS. SCOGLIO had just recently completed three very successful years with co-teacher, Ryan Hernandez. She and Mr. Hernandez were known throughout RCS by the nickname "The Dream Team." Their state assessment scores were commonly highest in the school. She had high-level

recommendations and observations from the former principal and staff. MS. SCOGLIO was a major part of the school's faculty, going to most fundraisers, school events, and even went on a mission trip to Haiti with another RCS staff member to teach the students about community outreach.

100)   MS. SCOGLIO also choreographed the finales for the school talent show and participated in most teacher acts. Plaintiff JACLYN SCOGLIO never had any issue with RIVERHEAD CHARTER SCHOOL until MR. ANKRUM became the principal in August 2012.

101)   MR. ANKRUM appointed Mr. Davidson as Plaintiff JACLYN SCOGLIO's co-teacher. Soon thereafter, MS. SCOGLIO went through a divorce, and a variety of other family issues, including a dying grandmother. Despite the tough times, MS. SCOGLIO did not miss one day of school. However, MR. ANKRUM expressed disappointment with the fact that MS. SCOGLIO was getting divorced. He stated that it was important for students to be taught by members of nuclear families, and that being divorced negatively affected MS. SCOGLIO's ability to teach the students (yet he failed to offer specific evidence as to how). Days after informing MR. ANKRUM of her divorce, MS. SCOGLIO was placed on an improvement plan in an act of discrimination and retaliation. In December 2012, MS. SCOGLIO appeared with Union representation to a meeting with MR. ANKRUM, and thereafter was taken off the improvement plan, with no non-discriminatory and non-retaliatory reasons for these actions.

102)   From September 2012 through January 2013, MS. SCOGLIO endured the "nightmare" of teaching with MR. ANKRUM's friend and roommate, Mr. Davidson. Mr. Davidson was not required to contribute in any meaningful way: he did not teach, type, read, or plan. All he had to do was show up. MS. SCOGLIO planned every subject, taught every subject,

graded all the papers, while Mr. Davidson sat at the computer on his cell phone doing work for his private business. MS. SCOGLIO's job, however, was in jeopardy if she did not agree with or follow Mr. Davidson's requests.

103)    Mr. Davidson told MS. SCOGLIO that he and MR. ANKRUM had daily conversations after hours about the teachers and who MR. ANKRUM was going to fire. It was a constant state of intimidation, feeling that MS. SCOGLIO's job was in jeopardy.

104)    In response to MS. SCOGLIO's professional opinions, MR. ANKRUM frequently insulted MS. SCOGLIO and said "I can't believe you have a social work degree." He would announce at staff meetings that "White teachers have no idea how to relate to black children," despite MS. SCOGLIO's and other teachers' experience teaching diverse populations for years.

105)    In approximately February 2013, Mr. Davidson, despite no prior teaching experience and no certifications, was promoted by MR. ANKRUM to Dean, an administrative position with an increase in salary. No one else was given the opportunity to apply for this position. Two other Caucasian female teachers, including MS. GORNIOK, with previous Dean experience were denied the opportunity to apply also.

106)    Interestingly, MR. ANKRUM would tell MS. SCOGLIO that she "could teach circles around other teachers." He told a thin teacher - that dressed provocatively - that she "sucked as a teacher". However, because she was thin, dressed provocatively, and did not speak her opinions contrary to MR. ANKRUM, she continued to be employed and was not reprimanded like MS. SCOGLIO was.

107)    In September 2013, MS. SCOGLIO was awarded Teacher of the Year for 2012-2013. Following that award, MS. SCOGLIO requested to become a "mentor" for another

teacher. MR. ANKRUM refused. Instead, he granted the mentor position to Mr. Davidson, who had requested to mentor the young attractive teacher, Ms. Marchese. Mr. Davidson was involved in a romantic relationship with this teacher, as described at length herein.

108)   In approximately December of 2013, Plaintiff JACLYN SCOGLIO was separated out as one of the "veterans" that voiced her support for the Union, and spoke out against MR. ANKRUM's illegal employment practices. Shortly thereafter, she was terminated for supposed violation of the School's cell phone policy. Meanwhile, the young teacher with whom Mr. Davidson was engaged in a sexual relationship used her cell phone in the same manner that supposedly led to Plaintiff's termination. This younger teacher was not disciplined for this cell phone use.

109)   Plaintiff JACLYN SCOGLIO was one of the Caucasian, older, female teachers MR. ANKRUM was determined to remove from the school. She was subjected to unlawful discrimination based upon her race, gender, and age. Plaintiff JACLYN SCOLGIO was sexually harassed in the hostile work environment MR. ANKRUM created, as she did not receive the same kind of preferential treatment given to the younger teachers with whom MR. ANKRUM wanted to engage in sexual relations.

110)   Plaintiff JACLYN SCOGLIO filed jointly a Complaint with the New York State Division of Human Rights (hereinafter, "NYSDHR") and the Equal Employment Opportunity Commission (hereinafter, "EEOC"). Said NYSDHR Complaint was later dismissed on Administrative Convenience. The dismissal of Plaintiff's EEOC Complaint followed shortly thereafter and a Dismissal and Notice of Rights was issued to allow a lawsuit to be filed in Court.

## FURTHER SPECIFIED ALLEGATIONS
## AS TO PLAINTIFF, KASEY WEHRHEIM

111)    Plaintiff, KASEY WEHRHEIM (hereinafter, "MS. WEHRHEIM"), hereby repeats, realleges, and reiterates Paragraphs 1-110 as though fully set forth herein.

112)    MS. WEHRHEIM is a Caucasian women formerly employed as a second-grade teacher at RCS in September 2008. Prior to MR. ANKRUM's hire MS. WEHRHEIM's reviews positive, and she was a cherished member of the RCS teaching community amongst students, parents, and other teachers. It was only after MR. ANKRUM's hire that she received negative reviews.

113)    In approximately October 2012, MR. ANKRUM approached MS. WEHRHEIM regarding Plaintiff, JACLYN SCOGLIO. MR. ANKRUM indicated to MS. WEHRHEIM that he did not like the fact that MS. SCOGLIO voiced her opinion. MR. ANKRUM advised MS. WEHRHEIM that she should talk to MS. SCOGLIO and "fix this," meaning convince MS. SCOGLIO to stop voicing her opinion, or assist in getting rid of MS. SCOGLIO.

114)    In approximately November 2012, MR. ANKRUM brought MS. WEHRHEIM into a secluded room, and proceeded to scream and curse at MS. WEHRHEIM over displeasure that MS. SCOGLIO was continuing to voice her opinions. In December 2012, MS. WEHRHEIM, attended a meeting with MS. SCOGLIO as her Union representative. Shortly thereafter, MR. ANKRUM informed MS. WEHRHEIM that she would be removed from one of her leadership positions, and that she would have to choose between House Leader of Grade K-3 or Union President.

115)    MS. WEHRHEIM, following the termination of MS. SCOGLIO, was in fear of MR. ANKRUM's retaliatory acts. She was in fear that she would be the next Caucasian, female, teacher to be subject to his retaliation for not playing along with his agenda.

116)   In January 2014, MR. ANKRUM approached MS. WEHRHEIM insisting that she hold a vote to see whether the staff wanted to keep the Union or decertify. MR. ANKRUM then indicated that he invented the story that a parent complained of MS. SCOGLIO's cell phone use during class. MR. ANKRUM revealed that it was really MS. SCOGLIO's co-teacher that made the complaint. MR. ANKRUM then implied that he wanted MS. WEHRHEIM to resign as Union President. She indicated she was considering resigning as Union president, but would never resign from teaching.

117)   In February 2014, MS. WEHRHEIM received a negative evaluation, and was placed on an improvement plan. In May 2014, MS. WEHRHEIM was terminated, allegedly due to one of her students' near misses with an egg allergy while under MS. WEHRHEIM's supervision.

118)   Plaintiff KASEY WEHRHEIM was one of the Caucasian, older, female teachers MR. ANKRUM was determined to remove from the school. She was subjected to unlawful discrimination based upon her race, gender, and age. Plaintiff KASEY WEHRHEIM was sexually harassed in the hostile work environment MR. ANKRUM created, as she did not receive the same kind of preferential treatment given to the younger teachers with whom MR. ANKRUM wanted to engage in sexual relations.

119)   Plaintiff KASEY WEHRHEIM filed jointly a Complaint with the NYSDHR and the EEOC. Said NYSDHR Complaint was later dismissed on Administrative Convenience. The dismissal of Plaintiff's EEOC Complaint followed shortly thereafter and a Dismissal and Notice of Rights was issued to allow a lawsuit to be filed in Court.

## FURTHER SPECIFIED ALLEGATIONS
## AS TO PLAINTIFF, ANDREA VAN EPPS

120)   Plaintiff, ANDREA VAN EPPS, hereby repeats, realleges, and reiterates Paragraphs 1-119 as though fully set forth herein.

121)   MS. VAN EPPS is a now-46-year-old Jewish, Caucasian woman. She is a certified Speech Pathologist, and in her many years of experience has developed a great rapport with her students and was known to be an exceptional educator. Prior to MR. ANKRUM's hire, MS. VAN EPPS was Special Education Coordinator of the RCS for approximately eight years and employed at RCS for ten years.

122)   Issues with MS. VAN EPPS's employment only began once she began working with MR. ANKRUM.

123)   MR. ANKRUM (believed to be of Christian faith) also made numerous taunting and sarcastic comments pertaining to MS. VAN EPPS's Jewish faith. When MS. VAN EPPS returned from Jewish holiday, Yom Kippur, also known as the Days of Atonement, MR. ANKRUM would snidely remark "you good now?" and that two days was "not enough" for MS. VAN EPPS to atone. Additionally, MR. ANKRUM would loudly call out the name of a Hasidic assemblyman running for office in a mocking tone as he passed MS. VAN EPPS in the hallway.

124)   MR. ANKRUM created an atmosphere of intimidation, often reminding MS. VAN EPPS that she was "the most expendable" and that she therefore better adhere to his guidelines. MR. ANKRUM created strife amongst the staff for MS. VAN EPPS, even admitting to lying and "making up" the falsehood that MS. VAN EPPS missed sessions "just to make a point."

125)   MR. ANKRUM hired younger, Catholic women to replace MS. VAN EPPS, despite the fact that their experience paled in comparison. He eliminated MS. VAN EPPS's

position, and then brought the younger women into her classroom as an intimidation tactic to make the workplace so unbearable that MS. VAN EPPS would not want to work at RCS. MR. ANKRUM would bait MS. VAN EPPS by sadistically praising the younger Catholic women in MS. VAN EPPS's presence for the same behaviors that had brought MS. VAN EPPS criticisms in the past. As a result of one year of verbal abuse, abusive and degrading emails, MS. VAN EPPS was forced reluctantly to discuss resigning from her eight-year position as Special Education Coordinator.

126)   MR. ANKRUM was open and obvious with respect to his preference for males and minorities. He commonly referred to MS. VAN EPPS as "white bread," even in front of other staff. In a conversation following a New York State United Teachers rally, MR. ANKRUM dismissed it solely because "there weren't a lot of blacks and Hispanics," making the clear point that he would only be concerned if it was based upon complaints of minorities.

127)   MR. ANKRUM's retaliation and intimidation included attempts to damage MS. VAN EPPS' career. MS. VAN EPPS approached MR. ANKRUM over her concern that Individualized Education Programs ("IEPs") were not being followed. When MS. VAN EPPS left on medical leave, the students with IEPs did not receive speech and language services at all. Following this, MR. ANKRUM lied, stating in an email that MS. VAN EPPS missed *60-plus* sessions. When MS. VAN EPPS confronted MR. ANKRUM about the email, stating that it was "potentially career-damaging" and not true, MR. ANKRUM stated that he "made the number up."

128)   Plaintiff ANDREA VAN EPPS was one of the Caucasian, older, female teachers MR. ANKRUM was determined to remove from the school. She was subjected to unlawful discrimination based upon her race, gender, and age. Plaintiff ANDREA VAN EPPS was

sexually harassed in the hostile work environment MR. ANKRUM created, as she did not receive the same kind of preferential treatment given to the younger teachers with whom MR. ANKRUM wanted ·to engage in sexual relations. MR. ANKRUM additionally subjected ANDREA VAN EPPS to religion discrimination, as he routinely made hurtful comments about her Jewish faith. Additionally, MS. VAN EPPS was discriminated against because of her disability, as she was terminated despite presenting RCS with a doctor's note confirming her diagnosis.

129)    Plaintiff ANDREA VAN EPPS filed jointly a Complaint with the NYSDHR and EEOC. Said NYSDHR Complaint was later dismissed on Administrative Convenience. The dismissal of Plaintiff's EEOC Complaint followed shortly thereafter and a Dismissal and Notice of Rights was issued to allow a lawsuit to be filed in Court.

## FURTHER SPECIFIED ALLEGATIONS
## AS TO PLAINTIFF, JEAN-MARIE TAS

130)    Plaintiff, JEAN-MARIE TAS, hereby repeats, realleges, and reiterates Paragraphs 1-129 as though fully set forth herein.

131)    MS. TAS is a now-52-year-old eclectically educated Caucasian woman. She has studied for extended periods in various countries, and is multi-lingual. She is a certified teacher in the areas of PreK-12, English as a Second Language (hereinafter, "ESL") PreK-12, Music PreK-12, and she is an educational specialist.

132)    MS. TAS was first hired by Riverhead Charter Schools as an ESL leave replacement in April 2008. She was soon offered a position for the following school year (2008-9) as a full-time ESL teacher and department coordinator. Between then and approximately August 2012, when MR. ANKRUM was hired as Principal, MS. TAS played a variety of roles, including full-time music teacher, full-time ESL teacher, and sometimes a split between the two

as two-half roles. MS. TAS exhibited great leadership and initiative as she essentially founded RCS's instrumental music program, bringing the school to N.Y.S.S.M.A. competitions on the county and state levels.

133)    Between April 2008 and approximately August 2012, MS. TAS was a model employee and an asset to the school. In August 2012, MR. ANKRUM was hired. Initially, he utilized MS. TAS for her vast experience as a music teacher, ESL teacher, and department head of each. He additionally employed MS. TAS's expertise in ensuring that RCS was compliant with state regulations on a variety of matters.

134)    MR. ANKRUM commonly criticized MS. TAS for "shopping at the nun store" because she wore below-the-knee skirts.

135)    MR. ANKRUM assigned MS. TAS to be a full-time music teacher in 2013-2014. In November 2013, MS. TAS suffered a traumatic brain injury, causing her to miss time intermittently until she had surgery on or about February 2, 2014. On or about March 28, 2014, MS. TAS informed RCS that she was advised by her doctor not to work until further notice. Further notes from physicians in May 2014 continued MS. TAS's disability time off "until further notice."

136)    Thereafter, RCS sent MS. TAS a "renewal of employment letter", indicating that MS. TAS was demoted to only a half-time position for the 2014-2015 school year. The full-time music position was given to a 23-year-old African-American male, who only recently graduated, and whose experience paled in comparison to MS. TAS's 25+ years of teaching experience.

137)    Plaintiff JEAN-MARIE TAS was one of the Caucasian, older, female teachers MR. ANKRUM was determined to remove from the school. She was subjected to unlawful discrimination based upon her race, gender, and age. Plaintiff JEAN-MARIE TAS was sexually

harassed in the hostile work environment MR. ANKRUM created, as she did not receive the same kind of preferential treatment given to the younger teachers with whom MR. ANKRUM wanted to engage in sexual relations. MR. ANKRUM additionally subjected JEAN-MARIE TAS to disability discrimination, as she was demoted following her traumatic brain injury.

138)    Plaintiff JEAN-MARIE TAS filed jointly a Complaint with the NYSDHR and the EEOC. Said NYSDHR Complaint was later dismissed on Administrative Convenience. The dismissal of Plaintiff's EEOC Complaint followed shortly thereafter and a Dismissal and Notice of Rights was issued to allow a lawsuit to be filed in Court.

## FURTHER SPECIFIED ALLEGATIONS
## AS TO PLAINTIFF, DONNA RUDDY

139)    Plaintiff, DONNA RUDDY, hereby repeats, realleges, and reiterates Paragraphs 1-138 as though fully set forth herein.

140)    MS. RUDDY is a now-48-year-old Caucasian woman. She was a teacher at RCS for approximately eight years without issue until RCS hired MR. ANKRUM. Prior to MR. ANKRUM's hire, MS. RUDDY received positive reviews from parents, other teachers, and students.

141)    Issues with MS. RUDDY's employment only began once she began working with MR. ANKRUM. MR. ANKRUM was open and obvious with respect to his preference for males and minorities. Shortly after meeting MS. RUDDY, MR. ANKRUM told MS. RUDDY that she would be his "special project". He had no intention of putting in special time to assist MS. RUDDY, but rather a surreptitious plan to eliminate her. In fact, in approximately November 2013, MS. RUDDY had a discussion with MR. ANKRUM pertaining to her classroom evaluation. MS. RUDDY asked whether she could go back to teaching her class. MR. ANKRUM

replied "you can go back, that's not the way you will go down, Ruddy." MR. ANKRUM's comment was threatening and intimidating.

142) In January 2014, MS. RUDDY filed Public Employment Relations Board (hereinafter, "PERB") charges with the Union for fear of being terminated in retaliation for her support of the recently-terminated Plaintiff MS. SCOGLIO. Immediately following the PERB charge, MS. RUDDY was informed she would have a formal observation. MR. ANKRUM used the formal observations as an intimidation and retaliation tactic. A formal observation was held on or about January 30th, 2014 in which MS. RUDDY was portrayed as a poor performing teacher, despite previous years of exceptional service. Thursday of that same week, MS. RUDDY was informed she would have further co-teacher meetings to discuss strategies. Instead, she was placed on an improvement plan. Thirty days later, MS. RUDDY's younger co-teacher was removed from said plan. MR. ANKRUM appeared more than ever to be on a mission to get rid of MS. RUDDY. MS. RUDDY was subjected to further observations, sometimes on multiple days in a row (unlike ever before) which MR. ANKRUM employed as a device of harassment and a clear indicator of his having targeted MS. RUDDY. On or about March 18, 2014, within a span of eight hours, two letters of reprimand were placed in MS. RUDDY's file. MS. RUDDY was never removed from the improvement plan. She was replaced by a younger, African-American teacher. MS. RUDDY informed MR. ANKRUM of a disability from which she suffered. On or about March 21, 2014, MS. RUDDY was disciplined for her disability. Neither MR. ANKRUM nor RIVERHEAD CHARTER SCHOOL offered MS. RUDDY an accommodation for her disability, and instead terminated her.

143) On or about March 31, 2014, two articles were printed in local newspapers, specifically naming MS. RUDDY's PERB charges. Following MS. RUDDY's second PERB

charge, this time for harassment, MR. ANKRUM entered a room in which MS. RUDDY and other staff were present, and said "today is a non-confrontational, non-intimidating day," which was a clear sarcastic and sadistic reference to MS. RUDDY's complaints.

144)   On or about May 24, 2014, MS. RUDDY was involved in an accident. On May 27, 2014, she began using sick days to deal with the severe injuries she sustained as a result. On June 10, 2014, following MS. RUDDY's request for FMLA leave, RCS began paying her lower wages.

145)   MR. ANKRUM also created a hostile work environment in his discrimination against disabled individuals by displaying his lack of concern for the disabled Caucasian students. In MS. RUDDY's final year of employment at RCS, she was in a co-teaching classroom. There were special education students in that room, which students required two teachers to be present. These students had formal Individualized Education Program statements ("IEP"), which clearly indicated the two-teacher requirement. On the days in which MS. RUDDY's co-teacher was absent, MR. ANKRUM failed to provide a substitute teacher.

146)   MS. RUDDY is and was well aware of MR. ANKRUM's distaste for Caucasian women, particularly overweight Caucasian women. She considers herself one of many Caucasian women MR. ANKRUM has targeted and laid off, given lesser responsibilities, and/or forced to quit. Ultimately, MS. RUDDY was terminated and her position was not renewed for 2014-2015 school year.

147)   Plaintiff DONNA RUDDY was one of the Caucasian, older, female teachers MR. ANKRUM was determined to remove from the school. She was subjected to unlawful discrimination based upon her race, gender, and age. Plaintiff DONNA RUDDY was sexually harassed in the hostile work environment MR. ANKRUM created, as she did not receive the

same kind of preferential treatment given to the younger teachers with whom MR. ANKRUM wanted to engage in sexual relations. MR. ANKRUM additionally subjected DONNA RUDDY to disability discrimination.

148)    Plaintiff DONNA RUDDY filed jointly a Complaint with the NYSDHR and the EEOC. Said NYSDHR Complaint was later dismissed on Administrative Convenience. The dismissal of Plaintiff's EEOC action followed shortly thereafter and a Dismissal and Notice of Rights was issued to allow a lawsuit to be filed in Court.

**FURTHER SPECIFIED ALLEGATIONS
AS TO PLAINTIFF, AMANDA PETRONIO**

149)    Plaintiff, AMANDA PETRONIO (hereinafter, "MS. PETRONIO"), hereby repeats, realleges, and reiterates Paragraphs 1-148 as though fully set forth herein.

150)    MS. PETRONIO learned early into her hire at RCS that MR. ANKRUM was against the union. On her first day of school in 2013, MR. ANKRUM brought her and other teachers outside and warned them that the union was useless, that it could not save their positions, and that she "should not even bother trying." MR. ANKRUM told MS. PETRONIO many times during her first year that if he "does not like a teacher, he gives them low scores on the first area of the formal evaluation." MR. ANKRUM told MS. PETRONIO that that is how he "gets people" and "it proves" that they are bad teachers.

151)    During her first year, MS. PETRONIO was approached by supporters of MR. ANKRUM to "take a walk outside" and sign a petition in which she agreed she did not want a union. In reality, MS. PETRONIO *did* want the union. MR. ANKRUM's supporters openly admitted that MR. ANKRUM asked them to "do his dirty work," and to "go around and ask teachers to sign the petition" because he "knew it was wrong for him to do." Mr. Davidson was one of the people MR. ANKRUM sent around to coerce teachers into signing this petition. Mr.

Davidson told MS. PETRONIO that, if MS. PETRONIO did not sign the petition, then she would probably lose her job.

152)    When MS. PETRONIO objected to MR. ANKRUM's unlawfully discriminatory and sexually harassing conduct, MR. ANKRUM told her that she is "only a second-year teacher," that she "knows nothing" about the "veteran teachers," that she should "know her place," and that it is "his way or the highway." MR. ANKRUM used intimidation to silence any dissent to his ways or support of the teachers he was harassing and discriminating against.

153)    MS. PETRONIO was one of the Caucasian, female teachers MR. ANKRUM was determined to remove from the school. She was subjected to unlawful discrimination based upon her race and gender. Plaintiff MS. PETRONIO was sexually harassed in the hostile work environment MR. ANKRUM created. MS. PETRONIO was known by MR. ANKRUM to associate with and be friendly with other Plaintiffs. MS. PETRONIO was also vocal of her objection to MR. ANKRUM's illegal employment practices. As a result, MS PETRONIO did not receive the same kind of preferential treatment given to the teachers that did not voice their objections to MR. ANKRUM's illegal employment practices.

154)    Plaintiff AMANDA PETRONIO's hostile work environment grew so unbearable that she wrote an email to the Board of Trustees complaining about the state of affairs at RCS. In that email, she begged for confidentiality with her stated reason being fear of losing her job and fear of MR. ANKRUM retaliating. The Board of Trustees ignored Plaintiff's request for confidentiality and sent the email to MR. ANKRUM. In an act of retaliation, MR. ANKRUM then forwarded Plaintiff AMANDA PETRONIO's email to a select group of teachers (with whom MR. ANKRUM believed he was allied), and asked them to hold a secret staff meeting. MR. ANKRUM made it seem like this staff meeting was one to which all teachers were invited.

However, only a select group was invited. Of course, word of the above got back to Plaintiff AMANDA PETRONIO. She was embarrassed and feared losing her job even more based upon MR. ANKRUM's retaliatory acts.

155)    Plaintiff AMANDA PETRONIO filed jointly a Complaint with the NYSDHR and the EEOC, and currently awaits her Dismissal and Notice of Rights to allow a lawsuit to be filed in Court.

156)    Following the filing of this lawsuit, MR. ANKRUM further retaliated against MS. PETRONIO. Prior to the commencement it was common for MR. ANKRUM to refer to those teachers, including Plaintiffs, that objected to his discriminatory and harassing conduct as "negative." He often referred to their objections collectively as "negativity."

157)    On the first day returning back to school, MR. ANKRUM addressed the staff. He told everyone to "stay away from the negativity." He also told the school that he would be "documenting everything, since now there's apparently no trust." These statements were clearly intimidatory and retaliatory messages to the entire staff that they should stay away from MS. PETRONIO and intended to deter future complaints. Additionally, certain teachers informed MS. PETRONIO that MR. ANKRUM specifically told them to "stay away from negativity." The above hastened and intensified the hostile work environment.

158)    On or about August 25, 2015, the teachers, including MS. PETRONIO, were given their schedules for the upcoming school year. They were asked to review the schedule to point out any errors, because RCS was aware that there were likely going to be some errors. MS. PETRONIO pointed out errors in her schedule and handed her schedule in as she was asked, and as many of the other teachers did. The following day, MS. PETRONIO was called into a meeting with the Dean to discuss her "concerns" over MS. PETRONIO's disappointment with her

schedule. This meeting was called to single out MS. PETRONIO and further intimidate her as a litigant in the lawsuit against RCS and MR. ANKRUM.

### FURTHER SPECIFIED ALLEGATIONS
### AS TO PLAINTIFF, SHERRIE ORESTIS

159) Plaintiff, SHERRIE ORESTIS, hereby repeats, realleges, and reiterates Paragraphs 1-158 as though fully set forth herein.

160) In approximately December 2012, SHERRIE ORESTIS heard MR. ANKRUM complaining to Mr. Davidson that he inherited the "most unattractive staff" MR. ANKRUM had ever seen and that he needed to make changes.

161) In approximately August of 2013, at a professional development session before the entire RCS staff, MR. ANKRUM asked which of the staff "had been here the longest." SHERRIE ORESTIS raised her hand. In front of the entire RCS staff, MR. ANKRUM pointed directly at SHERRIE ORESTIS and stated "you don't count". Thereafter, SHERRIE ORESTIS confronted MR. ANKRUM directly to complain about the harassing and discriminatory manner in which MR. ANKRUM speaks to her. MR. ANKRUM advised her that she "should not wear her feelings on her sleeve" and turned his back to her.

162) In the professional development sessions that took place thereafter, MR. ANKRUM intensified the manner in which he put SHERRIE ORESTIS down. When she raised her hand, MR. ANKRUM told her to put her hand down without allowing her to contribute. Other times, he ignored her.

163) At the aforementioned August 2013 professional development session in which a Caucasian woman MR. ANKRUM referred to as "White Chocolate" was brought in to speak, SHERRIE ORESTIS objected to the troubling teachings of the seminar, that "white women cannot teach black children." SHERRIE ORESTIS objected to this belief, stating that she was

insulted that she was being judged by the color of her skin. She also communicated to the entire room the discrimination and harassment she, herself, experienced growing up as a Jewish woman, and how she believed that contributed positively to her teaching experience and understanding of children that feel "different."

164)    At another professional development seminar, SHERRIE ORESTIS was separated into a group for being a "white silver spooner". When discussing the obstacles faced by minorities, SHERRIE ORESTIS attempted to incorporate into the discussion her experiences with Anti-Semetism. MR. ANKRUM refused to allow SHERRIE ORESTIS to incorporate this into this discussion, because he did not believe that Jewish people have the right to consider themselves "minorities". MR. ANKRUM did not believe that Jewish people suffered in a worthy enough manner to contribute to the discussion. The only discrimination and societal obstacle MR. ANKRUM wished to focus on was that occasioned upon African-Americans.

165)    SHERRIE ORESTIS was afraid to ask for time off for Jewish holidays. SHERRIE ORESTIS felt she needed to justify to MR. ANKRUM why she needed to take off for Jewish holidays as a result of the hostile work environment MR. ANKRUM created surrounding her Jewish beliefs. When SHERRIE ORESTIS asked to take off for Yom Kippur, she explained it was one of the holiest days of the year. MR. ANKRUM replied snidely, "if you really feel you must take off, then do so."

166)    SHERRIE ORESTIS additionally witnessed MR. ANKRUM's discrimination against non-African-American students with disabilities. Where African-American students were diagnosed with disabilities, MR. ANKRUM treated their needs with compassion and attention. Where Caucasian children needed this kind of attention, MR. ANKRUM insulted them, mocked them, and sought mechanisms to remove the child from RCS.

167)   Plaintiff SHERRIE ORESTIS was one of the Caucasian, older, female teachers MR. ANKRUM was determined to remove from the school. She was subjected to unlawful discrimination based upon her race, gender, and age. Plaintiff SHERRIE ORESTIS was sexually harassed in the hostile work environment MR. ANKRUM created, as she did not receive the same kind of preferential treatment given to the younger teachers with whom MR. ANKRUM wanted to engage in sexual relations. MR. ANKRUM additionally subjected MS. ORESTIS to religion discrimination, as he often made snide remarks about her Jewish faith.

168)   MR. ANKRUM was also vindictive. After shocking SHERRIE ORESTIS with her termination, which caused SHERRIE ORESTIS to cry, MR. ANKRUM went to her classroom to antagonize her. MR. ANKRUM sat down in front of the kindergarten class, stared and SHERRIE ORESTIS and then stated to the classroom of children: "Did you know that I am the smartest man around?" He capitalized upon and enjoyed the opportunity to gloat in front of SHERRIE ORESTIS, the woman he knew he had just crushed by terminating her from her beloved position.

169)   MR. ANKRUM refused to listen to any objection to his orders, even where students were at risk. MR. ANKRUM ordered SHERRIE ORESTIS to teach speech on many occasions. SHERRIE ORESTIS told MR. ANKRUM that this made her extremely uncomfortable because she was not trained in teaching speech and that she believed it was illegal for her to teach speech. MR. ANKRUM simply replied that SHERRIE ORESTIS was not to question the principal.

170)   MR. ANKRUM'S intimidation, hostile work environment, and retaliatory acts created a rift between many of the teachers. Those that were too afraid to stand up to him, and begrudgingly supported him in order to save their jobs, bullied other teachers, including

SHERRIE ORESTIS. Defendants condoned and ratified this bullying in order to further their discriminatory and racist agenda.

171) Plaintiff SHERRIE ORESTIS filed jointly a Complaint with the NYSDHR and the EEOC, and currently awaits her Dismissal and Notice of Rights to allow a lawsuit to be filed in Court.

**FURTHER SPECIFIED ALLEGATIONS
AS TO PLAINTIFF, FARAH MARTIN**

172) Plaintiff, FARAH MARTIN (hereinafter, "MS. MARTIN"), hereby repeats, realleges, and reiterates Paragraphs 1-171 as though fully set forth herein.

173) MS. MARTIN was hired by RCS in approximately August 2014. In approximately February 2015, MR. ANKRUM asked MS. MARTIN asked to apply for the "Specials Leadership Team" Position. Shortly thereafter, at a Black History Month schoolwide parent event, MR. ANKRUM called MS. MARTIN on stage in front of 300 people to praise her publicy on a "job well done."

174) Shortly thereafter, a newspaper article was written detailing MS. MARTIN's custody battle with her same-sex partner. Between her hire and the publication of this newspaper article, MS. MARTIN received glowing performance reviews from RCS, parents, and students. Following the release of the article, MR. ANKRUM emailed the news article to a number of teachers and staff at RCS. Shortly thereafter, MS. MARTIN was informed that she was terminated.

175) Plaintiff FARAH MARTIN was one of the Caucasian, older, female teachers MR. ANKRUM was determined to remove from the school. She was subjected to unlawful discrimination based upon her race, gender, and age. Plaintiff FARAH MARTIN was sexually harassed in the hostile work environment MR. ANKRUM created, as she did not receive the

same kind of preferential treatment given to the younger teachers with whom MR. ANKRUM wanted to engage in sexual relations. MR. ANKRUM additionally subjected FARAH MARTIN to sexual orientation discrimination.

176)    Plaintiff FARAH MARTIN filed jointly a Complaint with the NYSDHR and the EEOC, and currently awaits her Dismissal and Notice of Rights to allow a lawsuit to be filed in Court.

## FURTHER SPECIFIED ALLEGATIONS
## AS TO PLAINTIFF, BRANDON LLOYD

177)    Plaintiff, BRANDON LLOYD (hereinafter, "MR. LLOYD"), hereby repeats, realleges, and reiterates Paragraphs 1-176 as though fully set forth herein.

178)    MR. LLOYD was hired by RCS in August 2013. Leading up to his termination in March 2014, MR. LLOYD received stellar performance reviews from RCS, students, and parents. He is an African-American male, whom MR. ANKRUM generally treated as an ally. Immediately before MR. LLOYD's termination, MR. ANKRUM asked MR. LLOYD to sign a document by which signing MR. LLOYD would go on record in support of MR. ANKRUM and in opposition to the Plaintiffs, including MS. SCOGLIO and teachers that had voiced objections to MR. ANKRUM's illegal employment practices.

179)    MR. LLOYD declined to sign the document, and instead voiced his support for the Plaintiffs and teachers that had voiced their objections to MR. ANKRUM's illegal employment practices. MR. ANKRUM subsequently retaliated against MR. LLOYD by terminating him for his support of those objecting to illegal employment practices.

180)    MR. ANKRUM racially discriminated against MR. LLOYD. MR. LLOYD is bi-racial and identifies as African-American. However, on numerous occasions, MR. ANKRUM told MR. LLOYD that he "didn't grow up black."

## FURTHER SPECIFIED ALLEGATIONS
## AS TO PLAINTIFF, CORINNE GORNIOK

181)   Plaintiff, CORINNE GORNIOK (hereinafter, "MS. GORNIOK", hereby repeats, realleges, and reiterates Paragraphs 1-180 as though fully set forth herein.

182)   MS. GORNIOK is a now-37-year-old woman hired by RCS in July 2010. MS. GORNIOK received stellar performance reviews from RCS, students, and parents, as well as from previous employers. MS. GORNIOK is a Caucasian, older, female teacher. She is currently employed by RCS. However, she has suffered through MR. ANKRUM's above-described illegal employment practices ever since his hire. Despite her awareness of and general agreement with the complaints of MR. ANKRUM's illegal employment practices, MS. GORNIOK attempted to remain outwardly neutral for fear of losing her job. MR. ANKRUM's hostile work environment caused MS. GORNIOK to exist in fear.

183)   MR. ANKRUM associated MS. GORNIOK with the other Plaintiffs, and knew she supported those that spoke out against him, both as a friend and as one who agreed with their position.

184)   In approximately August 2013, as one of his calculated retaliatory measures, MR. ANKRUM placed MS. GORNIOK on probation for "low test scores." However, despite generally low test scores across the school, it was only MS. GORNIOK and another Plaintiff, MS. WEHRHEIM, that were placed on probation for such "low test scores." MR. ANKRUM additionally went further as to discipline and publicly shame MS. GORNIOK and her co-teacher for their "low test scores" in front of the school. MR. ANKRUM's motivations were not for the betterment of the student or the school, but rather a calculated message to squash any objection to his illegal ways. Additionally, MS. GORNIOK and her co-teacher had expressed concerns

about the upcoming test directly to MR. ANKRUM in the year prior, which concerns he largely ignored.

185)   MR. ANKRUM also employed slightly less conspicuous tactics in his attempt to "break" MS. GORNIOK from her support of the other Plaintiffs. For example, throughout the entire 2013-2014 school year, MR. ANKRUM ignored and/or bypassed MS. GORNIOK and spoke only to her co-teacher. MR. ANKRUM would call the classroom to ask for information regarding their lesson plans and demonstrations, and MR. ANKRUM would specifically ask to speak with other the co-teacher, even when MS. GORNIOK answered the phone and was, of course, fully capable of answering the questions. MS. GORNIOK's co-teacher was not similarly associated with the Plaintiffs and those who objected to MR. ANKRUM's illegal employment practices.

186)   In approximately January 2014, MR. ANKRUM commenced his post-observation feedback by stating in sum and substance "I know you are closing on a house tomorrow, I wanted to do this so you could have time to reconsider before you went through with it." Again, MR. ANKRUM used fear and intimidation to coerce Plaintiffs and squash any objection to his illegal employment practices.

187)   Shortly thereafter, MS. GORNIOK resigned from her union position. Shortly after her resignation, MS. GORNIOK was taken off probation.

188)   In approximately June 2015, MS. GORNIOK had a conversation with Mr. Davidson in which he indicated "[MR. ANKRUM's] plan was not to fire you, his plan was to put you in your place."

189)   MR. ANKRUM renewed MS. GORNIOK's contract for the 2015-2016 school year. However, MR. ANKRUM indicated to MS. GORNIOK that she "could no longer remain

neutral" and that he was "going to need her to speak up" in support of him "otherwise she was not going to last long." MR. ANKRUM tried to tell MS. GORNIOK who she should and should not have lunch with, and dissuaded her from befriending those teachers that spoke out against him. MR. ANKRUM told MS. GORNIOK that, if she heard negative remarks about him and the administration, that she needed to stand up in MR. ANKRUM's and RCS's defense. MS. GORNIOK replied that she "tries to stay neutral". MR. ANKRUM stated "you will not get by next year being even. Let me say this again, you will not get by next year being even."

190)    MR. ANKRUM threatened MS. GORNIOK that her failure to openly support him in the future would result in adverse tangible employment action. In other words, MR. ANKRUM explicitly intimidated MS. GORNIOK by telling her that she should not complain about any discrimination or she would lose her job. Additionally, it was only during MS. GORNIOK's year as Union officer that she was placed on her improvement plan. Upon her resignation from her position as Union officer as a result of pressure to do so from MR. ANKRUM, she was removed from the improvement plan.

191)    Plaintiff CORINNE GORNIOK was one of the Caucasian, older, female teachers MR. ANKRUM was determined to remove from the school. She was subjected to unlawful discrimination based upon her race, gender, and age. Plaintiff CORINNE GORNIOK was sexually harassed in the hostile work environment MR. ANKRUM created, as she did not receive the same kind of preferential treatment given to the younger teachers with whom MR. ANKRUM wanted to engage in sexual relations.

192)    Plaintiff CORINNE GORNIOK filed jointly a Complaint with the NYSDHR and the EEOC, and currently awaits her Dismissal and Notice of Rights to allow a lawsuit to be filed in Court.

193)    Following the filing of this lawsuit, MR. ANKRUM further retaliated against MS. GORNIOK. Prior to the commencement it was common for MR. ANKRUM to refer to those teachers, including Plaintiffs, that objected to his discriminatory and harassing conduct as "negative." He often referred to their objections collectively as "negativity."

194)    On the first day returning back to school, MR. ANKRUM sarcastically, vindictively, and with the intent to intimidate looked MS. GORNIOK in the eyes and said "*Good morning!*" Prior to the commencement of the instant lawsuit, MR. ANKRUM had never wished MS. GORNIOK "good morning," and the manner in which he addressed was clearly a gloating message to communicate to MS. GORNIOK that her involvement in the lawsuit was noted and that he was still very much in charge of the school.

195)    On the first day of school, MR. ANKRUM addressed the staff. He told everyone to "stay away from the negativity." He also told the school that he would be "documenting everything, since now there's apparently no trust." These statements were clearly intimidatory and retaliatory messages to the entire staff that they should stay away from MS. GORNIOK and intended to deter future complaints. Additionally, certain teachers informed MS. GORNIOK that MR. ANKRUM specifically told them to "stay away from negativity." The above hastened and intensified the hostile work environment.

196)    In approximately October 2015, the hostile work environment, harassment, discrimination and retaliation grew so unbearable at RCS that MS. GORNIOK was left with no choice but to resign.

## FURTHER SPECIFIED ALLEGATIONS
## AS TO PLAINTIFF, MAGGIE OLSEN

197)    Plaintiff, MAGGIE OLSEN (hereinafter, "MS. OLSEN", hereby repeats, realleges, and reiterates Paragraphs 1-196 as though fully set forth herein.

198)   MS. OLSEN was hired by RCS in May 2009. MS. OLSEN received stellar performance reviews from RCS, students, and parents. MS. OLSEN is a Caucasian, older, female teacher. She was terminated by Defendants. She suffered through MR. ANKRUM's above-described illegal employment practices ever since his hire. Despite her awareness of and general agreement with the complaints of MR. ANKRUM's illegal employment practices, MS. OLSEN attempted to remain outwardly neutral for fear of losing her job. MR. ANKRUM's hostile work environment caused MS. OLSEN to exist in fear.

199)   MR. ANKRUM tried to tell MS. OLSEN who she should and should not socialize with. He explicitly told MS. OLSEN not to befriend those teachers that spoke out against him. In fact, at one point following MS. WEHRHEIM's termination, and prior to MS. OLSEN's termination, MR. ANKRUM discovered a picture on social media depicting MS. OLSEN's presence at MS. WEHRHEIM's bridal shower. MR. ANKRUM asked MS. OLSEN why she was at MS. WEHRHEIM's bridal shower and remarked that he was surprised MS. OLSEN "still hung out with them." Soon thereafter, MS. OLSEN was terminated from RCS.

200)   Plaintiff MAGGIE OLSEN was one of the Caucasian, older, female teachers MR. ANKRUM was determined to remove from the school. She was subjected to unlawful discrimination based upon her race, gender, and age. Plaintiff MS. OLSEN was sexually harassed in the hostile work environment MR. ANKRUM created, as she did not receive the same kind of preferential treatment given to the younger teachers with whom MR. ANKRUM wanted to engage in sexual relations.

## FURTHER SPECIFIED ALLEGATIONS
## AS TO PLAINTIFF, BREANNA MCINTYRE

201)   Plaintiff, BREANNA MCINTYRE (hereinafter, "MS. MCINTYRE"), hereby repeats, realleges, and reiterates Paragraphs 1-200 as though fully set forth herein.

202)   MS. MCINTYRE was hired by RCS in approximately May 2009. MS. MCINTYRE received stellar performance reviews from RCS, students, and parents. MS. MCINTYRE is a Caucasian, female teacher. She was terminated by Defendants. She suffered through MR. ANKRUM's above-described illegal employment practices ever since his hire. Despite her awareness of and general agreement with the complaints of MR. ANKRUM's illegal employment practices, MS. MCINTYRE attempted to remain outwardly neutral for fear of losing her job. MR. ANKRUM's hostile work environment caused MS. MCINTYRE to exist in fear.

203)   In approximately late 2012 and into early 2013, MS. MCINTYRE began noticing that MR. ANKRUM and his right-hand man, Mr. Davidson were paying extra attention to her. MS. MCINTYRE had heard she was on the "hot list," and knew of MR. ANKRUM openly referring to her "nice tits" and "nice ass," which comments caused her great emotional distress. Mr. Davidson and MR. ANKRUM would find questionable amounts of time to lurk in MS. MCINTYRE's classroom and attempt to initiate flirtatious small talk. MS. MCINTYRE, busy with her work as a teacher, attempted to engage them as little as possible. She needed to complete her tasks as a teacher but felt pressured and intimidated from confronting them directly in light of their supervisory positions.

204)   Despite knowledge that that MS. MCINTYRE was involed in a relationship, Mr. Davidson repeatedly asked MS. INCINTYRE if she would like to go out with him and MR. ANKRUM for drinks. MS. MCINTYRE always declined. This continued through approximately March of 2013, until MS. MCINTYRE noted a marked decrease in the attention she received from MR. ANKRUM and Mr. Davidson.

205)    In approximately April of 2013, MR. ANKRUM sent an email to Ms. Lisa Marchese, a second-grade teacher, in which he informed her that he was unhappy with the "talent" of the second-grade teachers. The email informed Ms. Marchese, *inter alia*, that her contract was likely not going to be renewed for the following year unless she underwent a "360 degree metamorphosis from what [MR. ANKRUM had] seen this year" and that she would "have to totally recommit how [she looks] at this job in order for [MR. ANKRUM] to even consider alternative options." MS. MCINTYRE was a second-grade teacher at the time. Ms. Marchese informed MS. MCINTYRE of this email. Shortly thereafter, Ms. Marchese commenced a sexual relationship with Mr. Davidson, from which Ms. Marchese obtained afore-mentioned herein preferential treatment. MS. MCINTYRE, as punishment for her refusal and declination to succumb to the *quid pro quo* sexual harassment and denial of Mr. Davidson's and/or MR. ANKRUM's advances, was terminated at the end of the 2012-2013 school year.

206)    MR. ANKRUM tried to tell MS. MCINTYRE who she should and should not socialize with. He explicitly told MS. MCINTYRE not to befriend those teachers that spoke out against him. MR. ANKRUM, on multiple occasions, would call MS. MCINTYRE into his office and tell her to "check in" on other teachers in a spy-like manner and then report back. MS. MCINTYRE was uncomfortable with such requests and declined. As a result, MR. ANKRUM gave MS. MCINTYRE poor performance reviews in retaliation. MS. MCINTYRE was subsequently terminated.

207)    Plaintiff MS. MCINTYRE was one of the Caucasian, older, female teachers MR. ANKRUM was determined to remove from the school. She was subjected to unlawful discrimination based upon her race, gender, and age. Plaintiff MS. MCINTYRE was sexually harassed in the hostile work environment MR. ANKRUM created, as she did not receive the

same kind of preferential treatment given to the younger teachers with whom MR. ANKRUM wanted to engage in sexual relations.

### FURTHER SPECIFIED ALLEGATIONS
### AS TO PLAINTIFF, SUZANNE CHIORANDO

208)  Plaintiff, SUZANNE CHIORANDO (hereinafter, "MS. CHIORANDO", hereby repeats, realleges, and reiterates Paragraphs 1-207 as though fully set forth herein.

209)  MS. CHIORANDO was hired by MR. ANKRUM in December 2012. MS. CHIORANDO began working at RCS in January of 2013.  She worked under the supervision of MR. ANKRUM until January of 2014 when she was left with no choice but to resign.  During MS. CHIORANDO's employment at RCS, she learned very quickly that MR. ANKRUM was unprofessional and created a high stress work environment.  MR. ANKRUM had a select group of people who would follow any direction he gave, regardless of the legality of his orders. Those not included in MR. ANKRUM's "select group," including MS. CHIORANDO, those who were not willing to blindly follow every illegal request of MR. ANKRUM, were subjected to ridicule, stress, and ultimately firing.

210)  By February 2013, MS. CHIORANDO was diagnosed with a stress disorder. As a direct result of the stress endured under MR. ANKRUM's supervision, MS. CHIORANDO's medication this disorder had to be increased significantly at later dates as well. Since MS. CHIORANDO's departure from RCS, her stress-related disorder has declined.

211)  Even though MR. ANKRUM hired MS. CHIORANDO, she learned his retaliatory nature very quickly one MR. ANKRUM learned that MS. CHIORANDO supported the teachers MR. ANKRUM was against. MR. ANKRUM subjected her to ridicule and embarrassment over her lisp. MS. CHIORANDO was the victim of numerous intimidation tactics, including a warning that "JACLYN SCOGLIO's supplies were left in black garbage bags

for all teachers to see as a message for all those that did not follow MR. ANKRUM's ways." Additionally, MS. CHIORANDO was forced to sign a petition under duress, as she was brought off-site to a gas station, where she was told that she must sign the petition or lose her job.

212)   Ultimately, MS. CHIORANDO was faced with a situation that was so intolerable, stressful, and dangerous to her physical and mental health that she as left with no option but to resign. She suffered through MR. ANKRUM's above-described illegal employment practices ever since her. MR. ANKRUM's hostile work environment caused MS. CHIORANDO to exist in fear, and she could no longer withstand it.

213)   Plaintiff MS. CHIORANDO was one of the teachers MR. ANKRUM subjected to unlawful discrimination based upon her race, gender, and age. Plaintiff MS. CHIORANDO was sexually harassed in the hostile work environment MR. ANKRUM created, as she did not receive the same kind of preferential treatment given to the younger teachers with whom MR. ANKRUM wanted to engage in sexual relations.

### FIRST CAUSE OF ACTION
### AS TO JACLYN SCOGLIO, KASEY WHRHEIM, ANDREA VAN EPPS, JEAN-MARIE TAS, DONNA RUDDY, AMANDA PETRONIO, FARAH MARTIN, SHERRIE ORESTIS, CORINNE GORNIOK, MAGGIE OLSEN, BREANNA MCINTYRE, and SUZANNE CHIORANDO
**(Discrimination based upon Race, Gender, and Age in Violation of NYSHRL)**

214)   Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in Paragraphs 1-213 as though fully set forth at length herein.

215)   Defendants have discriminated against Plaintiffs on the basis of their Race, Gender, and Age in violation of the NYSHRL by denying them the same terms and conditions of employment available to employees who are not Caucasian, female, and/or older, including but not limited to, subjecting them to disparate working conditions and denying them the opportunity to work in an employment setting free of unlawful harassment.

216)    Defendants have discriminated against Plaintiffs on the basis of their Race, Gender, and Age in violation of the NYSHRL by creating, fostering, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive harassment of Plaintiffs because of their Race, Gender, and Age.

217)    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiffs have suffered and continue to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which they are entitled to an award of monetary damages and other relief.

### SECOND CAUSE OF ACTION
### AS TO ANDREA VAN EPPS, FARAH MARTIN, and SHERRIE ORESTIS
### (Discrimination based upon Religion in Violation of NYSHRL)

218)    Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in Paragraphs 1-217 as though fully set forth at length herein.

219)    Defendants have discriminated against Plaintiffs on the basis of their Religion in violation of the NYSHRL by denying them the same terms and conditions of employment available to employees who are not of Jewish faith, including but not limited to, subjecting them to disparate working conditions and denying them the opportunity to work in an employment setting free of unlawful discrimination.

220)    Defendants has discriminated against Plaintiffs on the basis of their religion in violation of the NYSHRL by creating, fostering, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive harassment of Plaintiffs because of their religion.

221)    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiffs have suffered and continue to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which they are entitled to an award of monetary damages and other relief.

### THIRD CAUSE OF ACTION
### AS TO ANDREA VAN EPPS, DONNA RUDDY, JEAN-MARIE TAS, and SUZANNE CHIORANDO
### (Discrimination based upon Disability in Violation of NYSHRL)

222)    Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in Paragraphs 1-221 as though fully set forth at length herein.

223)    Defendants have discriminated against Plaintiffs on the basis of their disability in violation of the NYSHRL by denying them the same terms and conditions of employment available to employees who are not suffering from a disability, including but not limited to, subjecting them to disparate working conditions and denying them the opportunity to work in an employment setting free of unlawful discrimination and denying them a reasonable accommodation for their disability.

224)    Defendants have discriminated against Plaintiffs on the basis of their disability in violation of the NYSHRL by creating, fostering, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive harassment of Plaintiffs because of their disability.

225)    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiffs have suffered and continue to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and

emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which they are entitled to an award of monetary damages and other relief.

## FOURTH CAUSE OF ACTION
## AS TO FARAH MARTIN
### (Discrimination based upon Sexual Orientation in Violation of NYSHRL)

226) Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in Paragraphs 1-225 as though fully set forth at length herein.

227) Defendants have discriminated against Plaintiff on the basis of her sexual orientation violation of the NYSHRL by denying her the same terms and conditions of employment available to employees who are not of same-sex sexual orientation, including but not limited to, subjecting them to disparate working conditions and denying them the opportunity to work in an employment setting free of unlawful discrimination.

228) Defendants has discriminated against Plaintiff on the basis of her sexual orientation in violation of the NYSHRL by creating, fostering, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive harassment of Plaintiff because of her sexual orientation.

229) As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiffs have suffered and continue to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which they are entitled to an award of monetary damages and other relief.

**FIFTH CAUSE OF ACTION**
**AS TO JACLYN SCOGLIO, KASEY WEHRHEIM, ANDREA VAN EPPS, JEAN-**
**MARIE TAS, DONNA RUDDY, AMANDA PETRONIO, FARAH MARTIN, SHERRIE**
**ORESTIS, CORINNE GORNIOK, MAGGIE OLSEN, BREANNA MCINTYRE, and**
**SUZANNE CHIORANDO**
**(Sexual Harassment in Violation of NYSHRL)**

230)     Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in Paragraphs 1-229 as though fully set forth at length herein.

231)     Defendants discriminated against the Plaintiffs by subjecting Plaintiffs to a hostile work environment, in the form of unwelcome sexual harassment and third-party sexual harassment, which was severe and pervasive, in violation of NYSHRL.

232)     Defendants discriminated against the Plaintiffs by subjecting Plaintiffs to unwelcome quid pro quo sexual harassment, which was severe and pervasive, in violation of NYSHRL.

233)     As a direct and proximate result of this unlawful discriminatory conduct in violation of NYSHRL, Plaintiffs have suffered and continues to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which they are entitled to an award of monetary damages and other relief.

**SIXTH CAUSE OF ACTION**
**AS TO JACLYN SCOGLIO, KASEY WEHRHEIM, ANDREA VAN EPPS, JEAN-**
**MARIE TAS, DONNA RUDDY, AMANDA PETRONIO, FARAH MARTIN, SHERRIE**
**ORESTIS, BRANDON LLOYD, CORINNE GORNIOK, MAGGIE OLSEN, BREANNA**
**MCINTYRE, and SUZANNE CHIORANDO**
**(Retaliation for Complaints of Discrimination/Harassment and/or Support for those who**
**have complained of Discrimination/Harassment in Violation of NYSHRL)**

234)     Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in Paragraphs 1-233 as though fully set forth at length herein.

235)    Defendants have retaliated against Plaintiffs, in violation of NYSHRL, for opposing and/or complaining of Defendants' sexual harassment and unlawful discriminatory practices against themselves and other employees at Defendant RCS by, inter alia, subjecting Plaintiffs to acts of discrimination, harassment and humiliation, mockery, encouraging and/or coercing Plaintiff's co-workers and supervisors to falsely contradict Plaintiff's truthful allegations of discrimination, harassment and/or retaliation, and/or terminating the Plaintiffs from employment.

236)    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of NYSHRL, Plaintiffs have suffered and continue to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which they are entitled to an award of monetary damages and other relief.

### SEVENTH CAUSE OF ACTION
### AS TO ANDREA VAN EPPS, KASEY WEHRHEIM, DONNA RUDDY, JACLYN SCOGLIO, and JEAN-MARIE TAS
**(Discrimination based upon Race and Gender, in Violation of § 1981, and based upon Age in violation of the Age Discrimination in Employment Act)**

237)    Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in Paragraphs 1-236 as though fully set forth at length herein.

238)    Defendants have discriminated against Plaintiffs on the basis of their Race, Gender, and/or Age in violation of the ADEA and § 1981 by denying them the same terms and conditions of employment available to employees who are not Caucasian, female, and/or older, including but not limited to, subjecting them to disparate working conditions and denying them the opportunity to work in an employment setting free of unlawful harassment.

239)   Defendants has discriminated against Plaintiffs on the basis of their Race, Gender, and Age in violation of the § 1981 by creating, fostering, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive harassment of Plaintiffs because of their Race, Gender, and/or Age.

240)   As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the § 1981 and the ADEA, Plaintiffs have suffered and continue to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which they are entitled to an award of monetary damages and other relief.

241)   Defendants' unlawful and retaliatory conduct in violation of §1981 was outrageous and malicious, was intended to injure Plaintiffs, and was done with conscious disregard of Plaintiffs' civil rights, entitling Plaintiffs to an award of punitive damages.

## EIGHTH CAUSE OF ACTION
## AS TO ANDREA VAN EPPS
### (Discrimination based upon Religion in Violation of § 1981)

242)   Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in Paragraphs 1-241 as though fully set forth at length herein.

243)   Defendants have discriminated against Plaintiff on the basis of her Religion in violation of § 1981 by denying them the same terms and conditions of employment available to employees who are not of Jewish faith, including but not limited to, subjecting them to disparate working conditions and denying them the opportunity to work in an employment setting free of unlawful harassment.

244)     Defendants has discriminated against Plaintiff on the basis of her religion in violation of § 1981 by creating, fostering, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive harassment of Plaintiff because of her religion.

245)     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of § 1981, Plaintiff has suffered and continues to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which she is entitled to an award of monetary damages and other relief.

246)     Defendants' unlawful and retaliatory conduct in violation of §1981 was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## NINTH CAUSE OF ACTION
### AS TO ANDREA VAN EPPS, DONNA RUDDY and JEAN-MARIE TAS
#### (Discrimination in Violation of the Americans with Disabilities Act)

247)     Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in Paragraphs 1-246 as though fully set forth at length herein.

248)     Defendants discriminated against the Plaintiffs by subjecting Plaintiffs to a hostile work environment in the form of discrimination based on Plaintiffs' disabilities which was severe and pervasive, in violation of American with Disabilities Act.

249)     Defendants discriminated against the Plaintiffs by subjecting Plaintiffs to discrimination based on their disability, which was severe and pervasive, and failing to provide reasonable accommodations in violation of American with Disabilities Act.

250)   As a direct and proximate result of this unlawful discriminatory conduct in violation of American with Disabilities Act, Plaintiffs have suffered and continue to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which they are entitled to an award of monetary damages and other relief.

### TENTH CAUSE OF ACTION
### AS TO ANDREA VAN EPPS, KASEY WEHRHEIM, DONNA RUDDY, JACLYN SCOGLIO, and JEAN-MARIE TAS
#### (Sexual Harassment in Violation of § 1981)

251)   Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in Paragraphs 1-250 as though fully set forth at length herein.

252)   Defendants discriminated against the Plaintiffs by subjecting Plaintiffs to a hostile work environment, in the form of unwelcome sexual harassment and third-party sexual harassment, which was severe and pervasive, in violation of § 1981.

253)   Defendants discriminated against the Plaintiffs by subjecting Plaintiffs to unwelcome quid pro quo sexual harassment, which was severe and pervasive, in violation of § 1981.

254)   As a direct and proximate result of this unlawful discriminatory conduct in violation of § 1981, Plaintiffs have suffered and continue to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which they are entitled to an award of monetary damages and other relief.

255)   Defendants' unlawful and retaliatory conduct in violation of §1981 was outrageous and malicious, was intended to injure Plaintiffs, and was done with conscious disregard of Plaintiffs' civil rights, entitling Plaintiffs to an award of punitive damages.

**ELEVENTH CAUSE OF ACTION**
**AS TO ANDREA VAN EPPS, KASEY WEHRHEIM, DONNA RUDDY, JACLYN SCOGLIO, and JEAN-MARIE TAS**
**(Retaliation for Complaints of Discrimination/Harassment and/or Support for those who have complained of Discrimination/Harassment in Violation of § 1981)**

256)   Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in Paragraphs 1-255 as though fully set forth at length herein.

257)   Defendants have retaliated against Plaintiffs, in violation of § 1981, for opposing and/or complaining of Defendants' sexual harassment practices against themselves and other employees at Defendant RCS by, inter alia, subjecting Plaintiffs to acts of discrimination, harassment and humiliation, mockery, encouraging and/or coercing Plaintiff's co-workers and supervisors to falsely contradict Plaintiffs' truthful allegations of discrimination, harassment and/or retaliation, and terminating the Plaintiffs from employment.

258)   As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of § 1981, Plaintiffs have suffered and continue to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which they are entitled to an award of monetary damages and other relief.

259)   Defendants' unlawful and retaliatory conduct in violation of §1981 was outrageous and malicious, was intended to injure Plaintiffs, and was done with conscious disregard of Plaintiffs' civil rights, entitling Plaintiff to an award of punitive damages.

## TWELFTH CAUSE OF ACTION
## AS TO ANDREA VAN EPPS, KASEY WEHRHEIM, DONNA RUDDY, JACLYN SCOGLIO, and JEAN-MARIE TAS
### (Retaliation in Violation of the § 1981)

260)    Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in Paragraphs 1-259 as though fully set forth at length herein.

261)    Defendants have retaliated against Plaintiffs in violation of § 1981 for opposing and/or complaining of Defendants' discriminatory practices against themselves by, inter alia, subjecting Plaintiffs to acts of discrimination, harassment and humiliation, mockery, encouraging and/or coercing Plaintiffs' and supervisors to falsely contradict Plaintiffs' truthful allegations of discrimination, harassment and/or retaliation, termination.

262)    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of § 1981, Plaintiffs have suffered and continue to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which they are entitled to an award of monetary damages and other relief.

263)    Defendants' unlawful and retaliatory conduct in violation of §1981 was outrageous and malicious, was intended to injure Plaintiffs, and was done with conscious disregard of Plaintiffs' civil rights, entitling Plaintiffs to an award of punitive damages.

## THIRTEENTH CAUSE OF ACTION
## AS TO JACLYN SCOGLIO, KASEY WEHRHEIM, ANDREA VAN EPPS, JEAN-MARIE TAS, DONNA RUDDY, AMANDA PETRONIO, FARAH MARTIN, SHERRIE ORESTIS, BRANDON LLOYD, CORINNE GORNIOK, MAGGIE OLSEN, BREANNA MCINTYRE, and SUZANNE CHIORANDO
### (Negligent Hiring, Retention and Supervision)

264)   Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in Paragraphs 1-263 as though fully set forth at length herein.

265)   Defendants have violated their duty as Plaintiffs' employer to provide a safe workplace, to take reasonable steps to determine the fitness of Plaintiffs' supervisors and to reasonably supervise Plaintiffs' supervisors by, inter alia, failing and refusing to investigate and/or take appropriate disciplinary or other action in response to Plaintiffs' repeated verbal and written complaints of discriminatory and harassing conduct by their co-workers and/or supervisors on the bases stated herein. Defendants had actual knowledge of the undue risk of harm to which they were thereby exposing Plaintiffs based on Plaintiffs' repeated written and verbal complaints to their supervisors, Human Resources officials, and state and federal agencies.

266)   As a direct and proximate result of Defendants' breach of duty to supervise, Plaintiffs have been injured and have incurred damages thereby.

## FOURTEENTH CAUSE OF ACTION
## AS TO JACLYN SCOGLIO, KASEY WEHRHEIM, ANDREA VAN EPPS, JEAN-MARIE TAS, DONNA RUDDY, AMANDA PETRONIO, FARAH MARTIN, SHERRIE ORESTIS, BRANDON LLOYD, CORINNE GORNIOK, MAGGIE OLSEN, BREANNA MCINTYRE, and SUZANNE CHIORANDO
### (Respondeat Superior)

267)   Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in Paragraphs 1-266 as though fully set forth at length herein.

268)    At all relevant times herein, Defendant MR. ANKRUM was performing duties for Defendant RIVERHEAD CHARTER SCHOOL when the sexual harassment, discrimination, and retaliation occurred.

269)    As a result, Defendant RIVERHEAD CHARTER SCHOOL is vicariously liable for all and any actions by Defendant RAYMOND ANKRUM during Plaintiffs' employment.

**FIFTEENTH CAUSE OF ACTION**
**AS TO JACLYN SCOGLIO, KASEY WEHRHEIM, ANDREA VAN EPPS, JEAN-MARIE TAS, DONNA RUDDY, AMANDA PETRONIO, FARAH MARTIN, SHERRIE ORESTIS, BRANDON LLOYD, CORINNE GORNIOK, MAGGIE OLSEN, BREANNA MCINTYRE, and SUZANNE CHIORANDO**
**(Aiding and Abetting Discrimination in Violation of the NYSHRL)**

270)    Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in Paragraphs 1-269 as though fully set forth at length herein.

271)    The NYSHRL prohibits any person from aiding, abetting, inciting, or compelling any of the acts which it forbids, or attempting to do so.

272)    As described above, Defendants aided and abetted the unlawful discriminatory practices perpetrated against the Plaintiffs.

273)    As a direct and proximate result of Defendants' aiding and abetting unlawful discrimination in violation of the NYSHRL, Plaintiffs have suffered and continue to suffer monetary and/or economic damages, including, but not limited to, loss of future income, compensation and benefits, mental anguish and emotional distress, loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of monetary damages and other relief.

## SIXTEENTH CAUSE OF ACTION
## AS TO BRANDON LLOYD
### (Discrimination based upon Race in Violation of NYSHRL)

274)    Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in Paragraphs 1-273 as though fully set forth at length herein.

275)    Defendants have discriminated against Plaintiff on the basis of his Race in violation of the NYSHRL by denying him the same terms and conditions of employment available to employees who, in Defendants' mind, are sufficiently "black," including but not limited to, subjecting them to disparate working conditions and denying them the opportunity to work in an employment setting free of unlawful harassment.

276)    Defendants have discriminated against Plaintiff on the basis of his Race in violation of the NYSHRL by creating, fostering, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive harassment of Plaintiff because of his Race.

277)    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which they are entitled to an award of monetary damages and other relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and against Defendants RIVERHEAD CHARTER SCHOOL and RAYMOND ANKRUM, containing the following relief:

1)      The Determination and adjudication of these matters together, or, in the alternative, the severance of each Plaintiff's separate action to allow each Plaintiff to separately seek the below relief;

2)      A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State of New York.

3)      A declaratory judgment that Defendant RIVERHEAD CHARTER SCHOOL is strictly and/or vicariously liable to the Plaintiffs for the discrimination complained of herein;

4)      Preliminary and permanent injunctions against Defendants, including Defendants' officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in the unlawful practices, policies, customs, and usages set forth herein, including, but not limited, the removal of Defendant RAYMOND ANKRUM from employment at Defendant RIVERHEAD CHARTER SCHOOL;

5)      An Order directing Defendant to place Plaintiffs in the positions they would have occupied but for Defendants' discriminatory treatment and otherwise unlawful conduct, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect their employment and personal life;

6)      An award of damages not less than $2,000,000.00 (two million dollars) in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all monetary and/or economic harm;

7)      An award of damages not less than $2,000,000.00 (two million dollars) in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all harm to their professional and personal reputations and loss of career fulfillment;

8)     An award of damages not less than $2,000,000.00 (two million dollars) in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all non-monetary and/or compensatory harm, including but not limited to, compensation for their mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, emotional distress and physical injuries;

9)     An award of damages not less than $2,000,000.00 (two million dollars) for any and all other monetary and/or non-monetary losses suffered by Plaintiffs in an amount to be determined at trial, plus prejudgment interest;

10)     An award of punitive damages not less than $2,000,000.00 (two million dollars), plus prejudgment interest, so as to punish the Defendants and deter them from committing future human rights violations of the sort detailed herein;

11)     An award of costs that Plaintiffs have incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law;

12)     An award of pre-judgment and post-judgment interest, as provided by law; and

13)     Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues of fact and damages stated herein.

**JURISDICTION – Federal Question**

The Court has Federal Question Jurisdiction pursuant Defendants' violation of Federal Law and their deprivation of Plaintiff's civil rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, the Americans with Disabilities Act, and the Age Discrimination in Employment Act. As such, this Honorable Court has Federal Question jurisdiction pursuant to the provisions of 42 U.S.C. § 1331.

## JURISDICTION -- Supplemental

Although claims arising under New York State law are interposed herein, this Honorable Court has jurisdiction over these claims pursuant to 42 U.S.C. § 1367. The claims asserted pursuant to state law arise out of the same nucleus of operative facts as those asserted pursuant to federal law, and it is respectfully submitted that it is logical that all claims are argued under the same case.

## VENUE

Pursuant to 42 U.S.C. § 1391, venue is proper in this district.

Dated: Garden City, New York
_10_|_6_|_2015_____

Yours, etc.

_____

JOSEPH G. DELL (JD-7315)
DELL & DEAN, PLLC
Attorneys for Plaintiffs
1225 Franklin Avenue, Suite 450
Garden City, New York 11530
(516) 880-9700


TO:   RIVERHEAD CHARTER SCHOOLS
      3685 Middle Country Rd
      Calverton, NY 11933

      RAYMOND ANKRUM
      3685 Middle Country Rd
      Calverton, NY 11933

Case No.: 2:15-cv-05214-SJF-GRB

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JACLYN SCOGLIO, KASEY WEHRHEIM,
ANDREA VAN EPPS, JEAN-MARIE TAS,
DONNA RUDDY, AMANDA PETRONIO, FARAH
MARTIN, SHERRIE ORESTIS, BRANDON LLOYD,
CORINNE GORNIOK, MAGGIE OLSEN, BREANNA
MCINTYRE and SUZANNE CHIORANDO

                                Plaintiffs,

        -against-

RIVERHEAD CHARTER SCHOOLS and RAYMOND
ANKRUM
                     Defendants.

# AMENDED COMPLAINT

## DELL & DEAN, PLLC

*Attorneys for Plaintiffs*
**1225 Franklin Avenue**
**Suite 450**
**Garden City, New York 11530**
**(516) 880-9700**
**Facsimile (516) 880-9707**

TO:   RIVERHEAD CHARTER SCHOOLS
       3685 Middle Country Rd
       Calverton, NY 11933

       RAYMOND ANKRUM
       3685 Middle Country Rd
       Calverton, NY 11933